# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

GUIDIVILLE BAND OF POMO INDIANS,
*Plaintiff-Appellee,*

v.

NGV GAMING, LTD, a Florida
partnership,
*Defendant-Appellant.*

No. 05-17066

D.C. No.
CV-05-01605-SC

NGV GAMING, LTD, a Florida
partnership,
*Plaintiff-Appellant,*

v.

HARRAH'S OPERATING COMPANY,
INC., a Delaware corporation,
*Defendant-Appellee.*

No. 05-17067

D.C. No.
CV-04-03955-SC

OPINION

Appeal from the United States District Court
for the Northern District of California
Samuel Conti, District Judge, Presiding

Argued and Submitted
October 16, 2007—San Francisco, California

Filed June 26, 2008

Before: Stephen S. Trott and N. Randy Smith,
Circuit Judges, and Milton I. Shadur,* Senior District Judge.

*The Honorable Milton I. Shadur, Senior United States District Judge
for the Northern District of Illinois, sitting by designation.

Opinion by Judge Shadur;
Dissent by Judge N.R. Smith

**COUNSEL**

Stephen J. Calvacca, Law Offices of Calvacca Moran, West Falmouth, Massachusetts; Terrence J. Cassidy, Law Offices of Porter, Scott, Weiberg & Delehant, Sacramento, California, for plaintiff-appellant/defendant-appellant NGV Gaming, LTD.

Stephen M. Hart and Kimberly A. Demarchi, Law Offices of Lewis and Roca LLP, Phoenix, Arizona; George L.

O'Connell, Craig C. Allison, Law Offices of Stevens & O'Connell LLP, Sacramento, California, for plaintiff-appellee Guidiville Band of Pomo Indians.

Stanley E. Siegel, Jr. and Diane B. Bratvold, Law Offices of Rider Bennett, LLP, Minneapolis, Minnesota, for defendant-appellee Harrah's Operating Company, Inc.

## OPINION

SHADUR, Senior District Judge:

This appeal presents the single, seemingly straightforward question whether the word "is" really means "is," at least as that word is employed in 25 U.S.C. § 81.[1] At the core of the present dispute, that statute requires the Secretary of the Department of the Interior ("Secretary") to approve any "contract with an Indian tribe that encumbers Indian lands for a period of 7 or more years" before such a contract can be considered valid. Section 81(a) defines the term "Indian lands" in part as "lands the title to which *is* held by the United States in trust for an Indian tribe" (emphasis added).

Appellant NGV Gaming Ltd. ("NGV") asks us to read Section 81 literally— as pertaining solely to contracts that implicate lands already held in trust by the federal government. Appellees Harrah's Operating Company ("Harrah's") and Guidiville Band of Pomo Indians ("the Tribe"[2]), on the other hand, urge a nonliteral reading of the statute—one that would treat Section 81 as also covering contracts in which the parties reach agreement, not with respect to already-held lands, but to acquire lands in the future that might eventually be held in

---

[1]That and all other provisions of Title 25 will hereafter be cited simply "Section —," omitting the prefatory "25 U.S.C."

[2]Because that Appellee has consistently referred to itself as "the Tribe" in its briefs, we too adopt the same shorthand reference.

trust. Under the latter interpretation the contract at issue in this appeal would be invalid, lacking as it does the Secretary's approval, and the district court's decision to dismiss NGV's suit against Harrah's for tortious interference with that contract would have to be affirmed. But under the first—and literal—reading, the district court's decision would be in error, and the state law action could proceed.

Motivated largely by the plain meaning of Section 81—but after also taking into account related statutes, relevant legislative history and the language of the contract itself—we conclude that the word "is" means just that (in the most basic, present-tense sense of the word) and that Section 81 therefore applies only to contracts that affect lands already held in trust by the United States. We therefore reverse the district court and remand for further proceedings.

## I.   Factual Background

### A.   Terms of the Contract

On July 3, 2002 the Tribe contracted with FEGV Corporation ("FEGV") for the latter to develop and construct a gaming facility on a to-be-acquired parcel of land in Northern California. In December 2003 FEGV assigned to NGV its rights and duties under that contract, which comprised two separate documents: (1) a Development Agreement and Personal Property Lease ("the Lease"), and (2) a Cash Management Agreement. Here is the purpose of the transaction as described at the outset of the Lease:

> The Tribe requires assistance with (i) financing the day-to-day operations of the Tribal government, (ii) acquiring real property and petitioning the United States to accept title to such property in trust for the benefit of the Tribe . . . , and (iii) the development, design, financing, construction and initial equipping of the Facility.

"Facility," the Lease explains, includes "buildings and improvements" that would be constructed on to-be-acquired real property and that would then be used to conduct Class II or Class III gaming[3] for the public. Both parties intended to transfer the to-be-acquired real property into trust, a process set forth under Section 465 that allows the United States to accept and hold property for the benefit of an Indian tribe.[4] But to be clear: No such land existed at the time the contract was entered into—nothing had been identified or acquired or, least of all, had been placed in trust.

NGV's role in that forward-looking endeavor was to use its "experience, expertise and resources . . . to assist the Tribe" in accomplishing its objectives. In exchange NGV would be compensated through a combination of fixed payments and a percentage of gross and net revenues earned by the newly constructed gaming facility. In addition NGV would enjoy other rights related to the land. Most notably, under the Lease the Tribe could not without NGV's consent:

> Sell, dispose of, lease, assign, sublet, transfer, mortgage or encumber (whether voluntarily or by operation of law) all or any part of its right, title, or interest in or to the Trust Lands, the Facility, or the Equipment.

---

[3]Class II gaming includes bingo and certain card games, but excludes any "banked card games, electronic games of chance, and slot machines" (Sections 2703(7)(A) and (B)). Class III gaming involves all other forms of high-stakes games (Section 2703(8)).

[4]Section 465 authorizes the Secretary "in his discretion, to acquire, through purchase, relinquishment, gift, exchange, or assignment, any interest in lands, water rights, or surface rights to lands . . . for the purpose of providing land for Indians." In addition the statute specifies (emphasis added):

> Title to any lands or rights acquired pursuant to this Act . . . shall be taken in the name of the United States *in trust for the Indian tribe* or individual Indian for which the land is acquired, and such lands or rights shall be exempt from State and local taxation.

Finally the Lease set forth several commitments, one of which is critically important to this appeal. It specified that the Tribe would "[o]btain all necessary and appropriate federal and tribal permits and approvals necessary with respect to the enforceability of the [Lease and Cash Management Agreement] or the operation of the Facility." Among such potential federal approvals was the approval contemplated by Section 81. Another potentially relevant federal statute was Section 2710(b)(2)(A), which calls for the Chairman of the National Indian Gaming Commission ("Gaming Commission") to approve "any tribal ordinance or resolution" involving Class II gaming on Indian lands.

## B.    Rescission of Tribe's Contract with NGV

Beginning in January 2004 Harrah's and Upstream Molate, LLC ("Upstream") partnered and entered into negotiations to purchase 354 acres of land from the City of Richmond, California. Harrah's and Upstream intended to place that land in trust on behalf of the Tribe and to use the land to build a gaming facility that the Tribe would operate. According to NGV, Harrah's and Upstream began those negotiations despite knowing of the Tribe's pre-existing obligations to NGV.

On August 2, 2004 the Tribe—acting through its chairperson, Merlene Sanchez—sent a letter to NGV seeking to rescind their contract. Sanchez explained that the Tribe had submitted their contract to the Bureau of Indian Affairs ("Bureau") and the Gaming Commission for both agencies' approval under Sections 81 and 2710. Because the Gaming Commission had already informed the Tribe that its contract with NGV was illegal, Sanchez concluded that the Tribe had "no choice but to rescind the agreement."

Indeed, in a letter dated July 21, 2004 the Gaming Commission explained that the Tribe's contract with NGV violated Section 2710(b)(2)(A). It stated that "the Agreements evidence Developer's proprietary interest in the Tribe's gaming

activity" and that such a proprietary interest contravened the Indian Gaming Regulatory Act ("IGRA").

Similar news came from the Bureau on April 13, 2005. After reviewing the Lease and Cash Management Agreement, that agency "concluded, as a matter of law, that the agreements must be approved by the Secretary under Section 81 in order for them to be valid and enforceable." Absent such approval, the Bureau explained, the contract was "unenforceable as a matter of law." Its conclusion, it noted, stemmed from information provided to it by attorneys for the Tribe "showing that the United States had accepted at least three parcels in Mendocino County, California, into trust for the benefit of the Tribe in 1999." Those 44 acres had been accepted into trust in 1999 with the intention that they would be used by the Tribe for residential development, not a gaming facility. Based on the existence of the Mendocino County property the Bureau "determined that the Tribe has an interest in 'Indian land' as defined in §81(a)," and that interest was encumbered by its contractual provision with NGV that "affirmatively require[s] the Tribe to refrain from selling or disposing of any part of an interest the Tribe has in Indian land . . . so long as the agreements remain in effect."

In August 2004—before having received the Bureau's letter but after having received the Gaming Commission's decision—the Tribe officially entered into an agreement with Harrah's and Upstream to develop and manage the Tribe's proposed gaming facility. That agreement contained an indemnification clause requiring the Tribe to defend Harrah's against any future claims made by NGV.

## C.   Procedural History

NGV eventually filed suit against both Upstream and Harrah's in the federal district court, alleging that those two defendants had tortiously interfered with its existing contract with the Tribe. Later the Tribe filed its own lawsuit seeking

declaratory and injunctive relief against NGV, asking to have the Lease and Cash Management Agreement declared invalid under applicable federal statutes. Both actions—NGV's against Upstream and Harrah's and the Tribe's against NGV —were later consolidated.

On July 28, 2005 the Tribe, Harrah's and Upstream all moved for summary judgment. NGV responded by contesting the district court's subject matter jurisdiction. It claimed that there was no case or controversy between NGV and the Tribe, for NGV had assured the Tribe that it would not file an action against it. For its part the Tribe contended that there was subject matter jurisdiction based upon (1) the Tribe's obligation to indemnify Harrah's against claims made by NGV and (2) the Tribe's continuing interest in developing a gaming facility without fear of litigation.

On October 19, 2005 the district court granted the Tribe's motion for declaratory relief. In particular the court held that (1) it had subject matter jurisdiction over the Tribe's declaratory relief action; (2) Section 81 applied to contracts involving lands not yet acquired and not yet transferred into trust; and (3) because the Secretary of the Interior had not approved the Tribe's contract with NGV as required under Section 81, the contracts were invalid. As a result the district court granted the Tribe's motion. In so doing it also granted Harrah's and Upstream's motion for summary judgment, dismissing NGV's tortious interference claim as a matter of law because no valid contract existed between NGV and the Tribe.

NGV timely filed this appeal. While it was pending this court granted NGV's motion for the voluntary dismissal of Upstream from the matter because those two parties had settled. In addition, while this appeal was pending the Tribe and Harrah's terminated their contract and entered into a settlement agreement that provided in part for the Tribe's continued indemnification of Harrah's against claims made by NGV

—but the Tribe acknowledges that its original contract with Harrah's (the one that spawned the termination and its continued indemnification undertaking) lacked the approval necessary under Section 2710.

## II.   Standards of Review

We review both the existence of subject matter jurisdiction and a grant of summary judgment de novo (*Galt G/S v. JSS Scandinavia*, 142 F.3d 1150, 1153-54 (9th Cir. 1998)). In reviewing the latter decision, we determine whether there are any genuine issues of material fact for trial, viewing the evidence in the light most favorable to the nonmovant (*Gammoh v. City of La Habra*, 395 F.3d 1114, 1122 (9th Cir. 2005)). We also review de novo the interpretation and construction of statutes (*Soltani v. W. & S. Life Ins. Co.*, 258 F.3d 1038, 1041 (9th Cir. 2001)), as well as the principles of contract interpretation as applied to the facts before us (*L.K. Comstock & Co. v. United Eng'rs & Constructors Inc.*, 880 F.2d 219, 221 (9th Cir. 1989)).

## III.   The Tribe's Claim Against NGV

We begin with the Tribe's effort to obtain a declaratory judgment, seeking a proclamation that its agreement with NGV was invalid because it had not been approved by the Secretary pursuant to Section 81 or, in the alternative, because it violated Section 2710. We have no occasion to decide the merits of those questions—at least not at this stage of this opinion[5] —because we conclude that the Tribe's efforts do not belong in the federal courts at all.

---

[5]Because the Tribe and Harrah's advance the same substantive arguments as to why the agreement between the Tribe and NGV is invalid, and because there is no doubt that this court has subject matter jurisdiction over NGV's claim against Harrah's, we eventually reach the merits of the case (see Section IV)—we just do not do so in the context of the Tribe's claim.

**[1]** It is undisputed that the Tribe's claimed adversary NGV has released it from any liability whatever, looking instead solely to a claim against Harrah's. And the Tribe has itself recognized that its management contract with Harrah's (which would have imposed on it an indemnification obligation covering NGV's claims against Harrah's) was void under Section 2705(a)(4) due to the Tribe's failure to have obtained approval of that contract by the Chairman of the Gaming Commission.[6] That being so, the Tribe cannot bootstrap itself into an Article III case or controversy vis-a-vis NGV by undertaking a new indemnification obligation as part of an agreement to terminate its already void contract with Harrah's—an indemnification promise that is wholly lacking in consideration and is hence itself invalid.[7]

In short, the Tribe—which does not itself face any potential liability to NGV—must try to fall back on its claimed sense of uncertainty about any future essays into the gambling industry. But those uncertainties exist only in outer space—they surely cannot be trotted out against NGV, with which the Tribe no longer has any contractual relationship or any ongoing exposure to liability. Instead such uncertainties raise wholly speculative concerns that call for a type of purely advisory opinion that federal courts are prohibited by the

---

[6]Because the Tribe's agreement with Harrah's was subject to a different statutory provision from the section applicable to the Tribe's agreement with NGV, such Section 2705(a)(4) invalidity did not extend to the latter.

[7]It is most disturbing that the Tribe and Harrah's parted company by terminating their agreement back in *March* of 2007 but concealed that fact until oral argument of the case was almost upon us months later (remember that the terminated contract was the peg on which the Tribe sought to hang its jurisdictional hat). Now the Tribe seeks to supplement the record before us with material previously withheld both from NGV and from this Court in an effort to salvage its claim. But as indicated in the text, any claimed case or controversy as between the Tribe and NGV ceased to exist once *their* contract was terminated and NGV released the Tribe from any potential liability, given the invalidity of the original Tribe-Harrah's agreement that contained the claimed indemnification provision.

Constitution from giving to putative litigants (see, e.g., *City of Los Angeles v. Lyons*, 461 U.S. 95, 106-07, 110-11 (1983), holding that because Lyons could not show that he "faced a real and immediate threat of again being illegally choked," his claim was "speculative" in nature and therefore could not meet Article III's "case or controversy" requirement).

As already stated, that alone should operate to knock the Tribe out of the box in terms of standing to pursue its own litigation. This case scenario poses a dramatic contrast to litigation such as a patent case seeking a declaratory judgment (see, e.g., *Société de Conditionnement en Aluminium v. Hunter Eng'g Co.*, 655 F.2d 938, 942-44 (9th Cir. 1981)), where there are two parties involved in the dispute with actual interests "of sufficient immediacy and reality" (*Maryland Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941)), even though no infringement action has been brought.

**[2]** If, as and when the Tribe chooses to engage in a future proposed entry into gambling activity with some other party and may then seek a declaration of its rights under a contract with *that* party, there may perhaps be federal subject matter jurisdiction to address that subject (a question that need not be answered here because it is purely hypothetical). But here, with the contractual relationship that once bound NGV and the Tribe already having been terminated, there is no one on the other side of the "v." sign from the Tribe—and that is fatal in jurisdictional terms. We thus vacate the district court's decision to grant the Tribe the declaratory relief it sought.

## IV.   NGV's Claim Against Harrah's

We turn now to NGV's claim that Harrah's tortiously interfered with the contract that once bound NGV and the Tribe. Under California law "[t]he elements of a cause of action for intentional interference with contract are: (1) a valid contract between plaintiff and a third party; (2) defendants' knowledge of the contract; (3) defendants' intentional acts designed to

induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage" (*Tuchscher Dev. Enters., Inc. v. San Diego Unified Port Dist.*, 132 Cal. Reptr.2d 57, 73 (Cal. Ct. App. 2003)). At issue in this appeal is the first element of the tort: NGV contends that its contract with the Tribe was valid because it did not require approval under Section 81, while Harrah's argues that the contract was invalid precisely because it lacked such approval. In the alternative, Harrah's argues that the contract violated Section 2710, which requires that an "Indian tribe have the sole proprietary interest and responsibility for any gaming activity."

We address each of those arguments in turn, tackling the Section 81 inquiry first. That inquiry calls for a consideration of a number of factors, including the plain language of the statute, the role (if any) of 1 U.S.C. §1, relevant legislative history and, of course, the actual language of the agreement that once bound NGV and the Tribe.

## A.  Plain Language of Section 81

Our analysis begins with the plain language of Section 81, not only because that is the natural starting point dictated by all accepted canons of statutory construction but also because the statute's unequivocal present-tense use of the word "is" does a tremendous amount of the legwork in settling one of the main questions raised on this appeal. In full Section 81(a) defines the term "Indian lands" as (emphases added):

> lands the title to which *is* held by the United States in trust for an Indian tribe or lands the title to which *is* held by an Indian tribe subject to a restriction by the United States against alienation.

Section 81(b) then prescribes:

> No agreement or contract with an Indian tribe that encumbers Indian lands for a period of 7 or more

years shall be valid unless that agreement or contract bears the approval of the Secretary of the Interior or a designee of the Secretary.

**[3]** In this instance the Tribe-NGV contract was not within the purview of Section 81 because it plainly did not implicate "Indian lands" in statutory terms. Section 81(a)'s use of the present tense in defining "Indian lands" unambiguously prescribes that title to the real estate must *already* be held by the United States in trust for a tribe. Had Congress intended that Section 81 also extend to lands that might later be held in trust, it would have been the simplest of matters to word the statute differently. That it did not do so is not a linguistic decision to be treated lightly (see *SEC v. McCarthy*, 322 F.3d 650, 656 (9th Cir. 2003), explaining that "Congress's explicit decision to use one word over another in drafting a statute is material" and adding that "[i]t is a decision that is imbued with legal significance and should not be presumed to be random or devoid of meaning"; *Biehl v. CIR*, 351 F.3d 982, 987 (9th Cir. 2003), writing that courts "will not stretch the statutory language to cover a situation not contemplated by Congress").

**[4]** Here the parties entered into their contract expressly contemplating— specifically intending—that land would *later* be identified and acquired and then *still later* transferred to the United States to be held in trust for the Tribe. But no such lands existed when the Tribe and NGV entered into their contract. Hence the portion of Section 81 that limits the duration of encumbrances on "Indian lands" is simply inapplicable to this case.

## B. Role of the Dictionary Act in Interpreting Section 81

**[5]** Contrary to the contention raised by the dissent, nothing in our reading of Section 81 contravenes 1 U.S.C. §1.**[8]** More

---

**[8]**That statute was not adverted to by either party in the original briefing on the appeal (or for that matter before the district court). We invited input

commonly referred to as the Dictionary Act, that statute reads in relevant part:

> In determining the meaning of any Act of Congress, unless the context indicates otherwise—
>
>     . . . .
>
>         words used in the present tense include the future as well as the present.

Focusing upon the phrase "words used in the present tense include the future as well as the present," the dissent asserts that the word "is" as used in Section 81(a) encompasses *both* lands that are currently held in trust by the United States for an Indian tribe *and* lands that might eventually be held in similar fashion. But in so doing, the dissent fails to grapple adequately with (1) the Supreme Court's repeated instructions regarding proper statutory construction and (2) the directive in the Dictionary Act itself that compels us to consider first the "context" of the statute.

[6] First, the Supreme Court has not once invoked the Dictionary Act in an effort to convert an unambiguous verb tense into claimed ambiguity, let alone then going on to employ that manufactured ambiguity as a stepping stone to altering the plain sense of a statute.[9] Here is the succinct directive in

_____

from the litigants on that score following oral argument, and each party has had ample opportunity to address through their supplemental briefing the question of what if any effect the Dictionary Act has on the interpretation of Section 81.

[9]On those limited occasions that the Supreme Court *has* turned to the Dictionary Act, it has done so to illustrate better the meaning of the word "person," which the statute defines as "includ[ing] corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals" (see, e.g., *Inyo County, Cal. v. Paiute-Shoshone Indians of the Bishop Cmty. of the Bishop Colony*, 538 U.S. 701,

*United States v. Wilson*, 503 U.S. 329, 333 (1992) and the cases that it cites:

> Congress' use of a verb tense is significant in construing statutes. See, *e.g.*, *Otte v. United States*, 419 U.S. 43, 49-50 (1974); *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc.*, 484 U.S. 49, 63-64, n.4 (1987).

Similarly, *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 450 (2002) made clear that in "all statutory construction cases, we begin with the language of the statute." Inquiries into the meaning of a statute come to an end "if the statutory language is unambiguous and the statutory scheme is coherent and consistent" (*id.*, quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997)(internal quotation marks omitted)). Given the specific and unambiguous manner in which Section 81(a) defines the term "Indian lands," it is not apparent why the Dictionary Act must even be consulted.

[7] Second, even on its own terms the Dictionary Act supports the analysis here: It looks first to "context," and only if the "context" leaves the meaning open to interpretation does the default provision come into play. As defined by *Rowland*, 506 U.S. at 199-200 (alterations in original, emphasis added):

---

713 n.1 (2003) (Stevens, J., concurring in judgment); *Rowland v. Cal. Men's Colony*, 506 U.S. 194, 196 (1993); *Ngiraingas v. Sanchez*, 495 U.S. 182, 190-91 (1990); *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 69 (1989)). We ourselves have relied on the Dictionary Act for the same purpose (see *United States v. Middleton*, 231 F.3d 1207, 1210 (9th Cir. 2000)). And on one other occasion we have relied on the Dictionary Act simply to corroborate an independent conclusion—derived solely from "the plain language of the statute"—that a criminal statute written in the present tense cannot be used to penalize past behavior (*United States v. Jackson*, 480 F.3d 1014, 1019 (9th Cir. 2007)). Because none of those cases approaches the situation presented here, none affects this decision.

"Context" here means the text of the Act of Congress surrounding the word at issue, *or the texts of other related congressional Acts*, and this is simply an instance of the word's ordinary meaning: "[t]he part or parts of a discourse preceding or following a 'text' or passage or a word, or so intimately associated with it as to throw light upon its meaning." Webster's New International Dictionary 576 (2d ed. 1942). While "context" can carry a secondary meaning of "[a]ssociated surroundings, whether material or mental," *ibid.*, we doubt that the broader sense applies here.

And *Rowland*, *id.* at 199 went on to explain that the word "indicates" broadens the scope of the inquiry that a court must make (*id.* at 200):

If "context" thus has a narrow compass, the "indication" contemplated by 1 U.S.C. §1 has a broader one. The Dictionary Act's very reference to contextual "indication" bespeaks something more than an express contrary definition, and courts would hardly need direction where Congress had thought to include an express, specialized definition for the purpose of a particular Act; ordinary rules of statutory construction would prefer the specific definition over the Dictionary Act's general one. Where a court needs help is in the awkward case where Congress provides no particular definition, but the definition in 1 U.S.C. §1 seems not to fit.[10] There it is that the qualification "unless the context indicates otherwise" has a real job to do, in excusing the court from forcing a square peg into a round hole.

---

**10**[Footnote by this Court] Of course that observation alone further strengthens our original position that the Dictionary Act need not even be considered, given that Congress *did* provide a specific definition of the term "Indian lands" in Section 81(a). We nonetheless continue down this analytical path so as to respond to the dissent's argument on its own terms.

With that guidance in mind, we consider a series of congressional acts related to Section 81—specifically, Sections 465, 2719 and 271—that clearly avoid an "awkward" rendering of Section 81.

Sections 465 and 2719 are particularly instructive, for they respond directly to the dissent's concern that construing Section 81 so that it applies only to contracts involving lands already in trust would allow parties to evade federal review entirely. Manipulative parties, the dissent fears, could take advantage of such an interpretation by carefully orchestrating the timing of any agreement so that any provision encumbering Indian lands would be executed only before placing land in trust. But such fears are more than adequately assuaged by the existence of Sections 465 and 2719, both of which guarantee that a contract such as the one that NGV and the Tribe had entered into can never escape the federal government's attention.

First, Section 465 (already quoted in n.4) and its implementing regulations set forth an extensive review process that the Secretary of the Interior must undertake *before* taking lands into trust (see, e.g., 25 C.F.R. §§151.3, 151.11(c); Larry E. Scrivner, *Acquiring Land into Trust for Indian Tribes*, 37 NEW ENG. L. REV. 603, 606-07 (2003)("Scrivner"),[11] describing the trust application process and the Secretary's duty to investigate, among other things, the purpose for which the land will be used and the effect that placing the land into trust will have on the tax bases of local government; Mary Jane Sheppard, *Taking Indian Land Into Trust*, 44 S.D. L. REV. 681, 687-88 (1998-99) ("Sheppard"),[12] similarly describing the comprehensive nature of a Section 465 review). During

---

[11]At the time Scrivner authored that piece, he was serving as acting director of the Bureau's Office of Trust Responsibilities.

[12]Sheppard has previously served as a staff attorney for the Gaming Commission and for the Division of Indian Affairs, Office of the Solicitor in the Department of the Interior.

such a review a tribe is first required to address, among other issues, its need for the land, the purpose for which the land will be used, the effect that taking the land into trust would have on state and local political subdivisions and whether a decision to take the land into trust would comply with the National Environmental Policy Act (see Scrivner, 37 NEW ENG. L. REV. at 606). With that initial information in hand, the Department of the Interior then gives state and local governments the opportunity to object to the tribe's application through "evidentiary documentation" demonstrating why taking the land into trust would "impact[ ] their jurisdiction or their tax base" (*id*. at 607). Only after all sides have provided their input does the Department begin its own independent examination of the trust application, a process that "requires a thorough analysis of all the facts and documentation, environmental clearances, archaeological studies, and all of the things that weigh into the action" (*id*.). Any final decision is subject both to a similarly extensive administrative appeals process and to a subsequent review in the federal courts (*id*.).

And relatedly, in cases where the tribe intends to use lands transferred into trust for gaming purposes, Section 2719(b)(1)(A) requires that the Secretary first "determine[ ] that a gaming establishment . . . would be in the best interest of the Indian tribe and its members, and would not be detrimental to the surrounding community" (see also Sheppard, 44 S.D. L. REV. at 687). In short, any concern that NGV was trying to game the system by executing its contract with the Tribe before transferring land into trust is wholly unfounded. Instead any *later* effort to take lands into trust triggers an extensive review process by the Secretary—a review that is far more meaningful than any Section 81 proceeding that would deal with not-yet-identified lands that might be taken into trust in the future, because a Section 465 proceeding addresses the suitability of a *specific* parcel of land in *all* respects, rather than the totally speculative process that is necessarily involved when a presently unknown future acquisition is sought to be made the subject of an attempted analysis.

Sections 2710(d)(3)(A) and 2710(d)(7) also help illuminate the meaning of Section 81, particularly because both are part and parcel of IGRA, which defines "Indian lands" in much the same manner as Section 81 (see Section 2703(4)(B) (emphasis added), defining "Indian lands" in part as "any lands title to which *is* held in trust by the United States for the benefit of any Indian tribe . . . ."). Section 2710(d)(3)(A) provides:

> Any Indian tribe having jurisdiction over the Indian lands upon which a class III gaming activity is being conducted, or is to be conducted, shall request the State in which such lands are located to enter into negotiations for the purpose of entering into a Tribal-State compact governing the conduct of gaming activities.

If any State should fail to enter into such negotiations, Section 2710(d)(7) provides the Indian tribe with a series of remedies, including the right to initiate an action against the State in federal district court. But to bring such an action, as the Sixth Circuit has held in *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Engler*, 304 F.3d 616, 618 (6th Cir. 2002), the Indian tribe must show that it has "Indian lands" as defined by IGRA at the time of filing. *Match-E-Be-Nash-She-Wish*, *id.* spelled out the rationale underlying its conclusion in terms that bear considerably on the Section 81 question now before us:

> Under § 2710(d)(3)(A), it is clear that the State does not have an obligation to negotiate with an Indian tribe until the tribe has Indian lands. The purposes of this requirement appear to be to ensure that the casino will be inside the borders of the State, to give the State notice of where it will be, and to require the tribe to have a place for the casino that has been federally approved. If the Indian tribe does not have any land in the State that can be used for a casino, why

should the State waste its time negotiating about such a casino? In the absence of a location, the State would have no way to assess the environmental, safety, traffic, and other problems that such a casino could pose.

Accord, *Mechoopda Indian Tribe of Chico Rancheria, Cal. v. Schwarzenegger*, No. Civ. S-03-2327WBS/GGH, 2004 WL 1103021, at *5 (E.D. Cal. Mar. 12, 2004).

Given those practical concerns, it is no wonder that the Bureau's policy has been to review contracts under Section 81 only when they involve lands currently held in trust by the United States. That policy is evinced by the Bureau's own April 13, 2005 letter to the Tribe, which made clear that its conclusion that the NGV-Tribe agreement was invalid for lack of Section 81 approval was predicated on the Tribe's lawyers having alerted the Bureau to its Mendocino County property, not to the possibility of acquiring future trust lands.[13]

That same policy is further confirmed through an affidavit included in the record by NGV from Kevin Gover ("Gover"), a former Assistant Secretary for Indian Affairs. Gover attests that during his tenure from late 1997 to early 2001, "it was not the [Bureau's] policy or practice to review contracts to determine whether such contracts fall within the scope of 25

---

[13]In that letter the Bureau wrote that "[a]t an earlier stage of our review, it was not clear whether the United States held title to any land in trust for the benefit of the Tribe, and, *as a consequence*, whether the agreements covered any 'Indian land' as defined in 25 U.S.C. §81(a)" (emphasis added)). Thus the Bureau concluded that Section 81 applied to NGV's contract with the Tribe only after "[a]ttorneys for the Tribe . . . provided [the agency] with documents showing that the United States accepted at least three parcels in Mendocino County, California, into trust for the benefit of the Tribe in 1999." If the Bureau had viewed Section 81 as applying to contracts involving lands that would *later* be transferred into trust, the existence of the Mendocino County property would have been irrelevant to its analysis of the NGV-Tribe contract.

U.S.C. §81(b) . . . in the absence of the existence of trust lands." Instead, in cases "where the purpose of the contract between a developer and a tribe [was] to assist the tribe in acquiring real property, and petitioning the United States to accept title to such property in trust for the benefit of the tribe," the Bureau's review would be done pursuant to the regulations implementing Section 465. As Gover puts it: "[t]he Secretary's acceptance of title to the subject property in trust for the petitioning tribe subsumes all approvals required under Federal law." And as all of that applies to the facts before us, the fact that the Tribe and NGV would eventually have to undergo Section 465 review if their later-acquired lands were to be transferred into trust obviated any need to have their contract approved under Section 81.

**[8]** In conclusion, there is no reason to resort to the Dictionary Act's default rules of statutory interpresentation. Instead the context here clearly indicates that Section 81 is limited only to reviewing those contracts involving presently held trust lands.

## C.   Legislative History of Section 81

Our literal reading of Section 81 is further corroborated by the statute's legislative history.[14] In seeking to persuade us to read Section 81 other than in plain-language terms, Harrah's points to some cases that, it claims, identify a legislative history of Section 81 that supports a nonliteral reading. We have reviewed those cases as well as the pertinent legislative his-

---

[14]To be sure, *Rowland*, 506 U.S. at 199 does not treat legislative history as part of the "context" of a congressional act as that word is used in the Dictionary Act. But legislative history of course remains a frequently-relied-upon additional tool of statutory interpretation (see, e.g., *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1111 (9th Cir. 2007), explaining that its plain-language interpretation of the statute at issue was also "supported by legislative history"). And it seems particularly appropriate to consider the legislative history of Section 81 here, when each of the parties has sought to bolster its arguments with that information.

tory, and we conclude that those sources not only fail to support the position advanced by Harrah's but that they instead further corroborate our own plain-language statutory reading.

Thus Harrah's seeks to call to its aid *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766 (1985), but that case significantly couched its view in terms that federal statutes relating to Indian tribes "are to be construed liberally in favor of the Indians, *with ambiguous provisions interpreted to their benefit*" (emphasis added). Here that proposition does not aid Harrah's, for Section 81's present-tense wording leaves no room for ambiguity.[15] Indeed, even the *Blackfeet Tribe* concept of liberal construction "in favor of the Indians" does not call for a nonliteral reading of Section 81(b), for requiring that more—rather than fewer—contracts be approved under Section 81(b) "would frustrate Indian tribes' efforts to promote economic development and fiscal autonomy" (*Penobscot Indian Nation v. Key Bank of Me.*, 112 F.3d 538, 554 (1st Cir. 1997), adding that the court's "analysis reflects the modern trend in federal Indian policy away from outmoded paternalistic practices and policies").

Section 81's own evolution confirms the advent of that more modern attitude toward Indian tribes, a perspective that the dissent does not acknowledge. That statute was originally enacted in 1872 to "reflect[ ] Congressional concerns that Indians, either individually or collectively, were incapable of protecting themselves from fraud in the conduct of their eco-

---

[15]Even less (if indeed any) weight is to be ascribed to the comparable language employed in *A.K. Mgmt. Co. v. San Manuel Band of Mission Indians*, 789 F.2d 785 (9th Cir. 1986), also sought to be relied on by appellees. *A.K. Mgmt.* involved an earlier and substantively different version of Section 81—one that did not speak of "encumber[ing] Indian lands," but rather of agreements made with Indians that were "relative to their lands" (see 25 U.S.C. §81 as it existed until the year 2000). Moreover, *A.K. Mgmt.* involved a dispute over land that was already held in trust by the United States for an Indian tribe. For more than one reason, then, that case does not at all influence today's outcome.

nomic affairs" (see S. REP. NO. 106-150, at 2 (1999), adding that "[t]he first and principal need then was that [Indians] should be shielded alike from their own improvidence and the spoliation of others"). But in 1934 Congress shifted the focus of its Indian policy by enacting the Indian Reorganization Act ("Reorganization Act") that "represented a fundamental break with [the] policy" underlying Section 81 (see *id*.). As the 1999 Senate Report, *id*. (alteration in original and internal quotation marks omitted) went on to say:

> The intent and purpose of the [Reorganization Act] was to develop the initiative destroyed by a century of oppression and paternalism . . . . [It] seeks to get away from the bureaucratic control of the Indian Department, and it seeks further to give the Indians the control of their own affairs and of their own property.

Following passage of the Reorganization Act, administrative agencies and courts were left "with the difficult task of reconciling an 1872 statute that sought to protect Indian tribes by imposing extensive federal oversight with a 1934 Act intended to disentangle the tribes from official bureaucracy" (*id*. (internal citation omitted)). Fortunately Congress simplified that task in 1999 when it amended Section 81. Those amendments—which, among other changes, replaced the term "relative to" Indian lands with "encumbers" Indian lands[16] — "ensure[d] that Indian tribes will be able to engage in a wide array of commercial transactions without having to submit those agreements to the BIA as a precaution" (*id*. at 9; see also *id*., expressly noting that the 1999 amendment "eliminated the overly-broad scope" of Section 81).

[9] Put simply, the tables have turned since 1872. Although at an earlier point courts may have been able to use the *Blackfeet Tribe* presumption to justify a nonliteral expansion of

---

[16]See n. 15.

Section 81, certainly the most recent amendment to that stat-
ute makes clear that Congress now considers self-
determination—not paternalism—to be in the Indians' best
interest. And that goal is more directly advanced by a literal
rather than a nonliteral reading of Section 81.

### D.  Language of the Lease and Mendocino County Property

With all of that said, we turn now to the actual language of
the Lease to demonstrate that under the literal present-tense
reading of Section 81, it does not apply to the only lands that
the United States already held in trust for the Tribe's benefit
at the time the Tribe-NGV agreement was entered into. Tak-
ing issue with our addressing the specifics of the contract, the
dissent argues that this is a task best left in the first instance
to the district court, particularly when "parol evidence" is
involved. But our reading is based on the words of the con-
tract itself (see n.17), and contract interpretation has always
been a matter of pure law that needs no preliminary screening
by the district court. And our reference to the contract directly
addresses Harrah's argument—indeed the primary one that it
has raised on appeal—that the Lease implicates the Mendo-
cino County, California property already held in trust for the
Tribe. Because it is exceedingly plain that neither the Tribe
nor NGV ever contemplated that the document would extend
to the Mendocino County lands, we hold that the agreement
binding those two parties was valid without the Secretary's
approval.

It is of course true that the Tribe's 44 acres in Mendocino
County qualify as "Indian lands" as that term is defined by
Section 81. And it is equally true that such acreage was taken
into trust by the United States for the benefit of the Tribe in
1999, well before NGV and the Tribe formalized their busi-
ness relationship. But the Mendocino County land issue is
really a red herring: Both the unambiguous language of the
Lease and, at least as importantly, the equally unambiguous

facts as to that property itself confirm that the Mendocino County lands are not at all within the purview of the parties' transaction and were therefore not even arguably encumbered by the Lease.

**[10]** Under the terms of the Lease, NGV and the Tribe partnered not to develop a casino on *existing* tribal land, but because the Tribe "require[d] assistance . . . *acquiring real property and petitioning the United States to accept title to such property in trust* for the benefit of the Tribe" (emphasis added). With the Mendocino County property already in hand —and having been accepted into trust—when the parties entered into their deal, the Lease cannot fairly be read as providing (or even contemplating) that such property would or could become the eventual site of the casino. It would make no sense at all, of course, to speak of "acquiring" already-owned real property. And it must be remembered that the Mendocino County property had been acquired expressly for residential development, *not* for commercial development. Nothing suggests that such purpose had changed in any respect either before or at the time that NGV and the Tribe entered into their agreement.

Additional language from the Lease further supports our conclusion. According to the Lease's "Master Definitions List," "Trust Lands" is described as:

> Property held by the United States in Trust for the benefit of the Tribe.

"Property" is in turn defined in terms of the future, not the present (emphasis added):

> The real property upon which the Structure *will be constructed* by Developer, which *at the time of construction will be titled to the United States in trust for the benefit of the Tribe*.

"Structure" is similarly defined as:

> The buildings and improvements constructed and installed on the Trust Lands on which the Tribe operates the Facility.

And finally, "Facility" is defined as:

> The Structure, equipped and ready for the Tribe to conduct Gaming for the public.

[11] With that definitional chain, the Lease provision sought to be relied on by Harrah's cannot reasonably be read as embracing the Tribe's acreage in Mendocino County. If that were to be done, "Property" would not be defined only in the future tense and "Structure" and "Facility" would not be defined in terms of a public gaming facility rather than private housing. In short, because the Mendocino County property was already held in trust and because it had been specifically slated—and remained slated—for residential development, that property simply does not come within the provision of the Lease restricting the Tribe's ability to alienate "Trust Lands."[17]

### E.   Inapplicability of Section 2710

[12] To this point we have demonstrated in a number of different ways why Section 81 is inapplicable to the situation before us. But finally we soldier on to speak far more briefly to the substantially more attenuated possibility that the par-

---

[17]It is worth noting that NGV maintains that a deposition of Sanchez, which is included in the record, further bolsters its position that the parties never intended their agreement to cover the Mendocino County property. On appeal the parties have vigorously disputed whether we should consider such parol evidence in interpreting their agreement. Because of the clarity of the matters already discussed, we have felt no need to look to the deposition and, as a result, no need to resolve the parties' disagreement over the propriety of parol evidence.

ties' agreement could somehow have violated Section 2710. As before, that inquiry begins by recourse to the plain statutory language. And by its express terms, Section 2710 pertains only to tribal ordinances or resolutions—not to a tribe's contract with a third party—so that nothing in that statute impairs the validity of the Tribe-NGV agreement.

Under Section 2710(b)(2)(A)(emphases added) the Chairman of the Gaming Commission:

> shall approve *any tribal ordinance or resolution* concerning the conduct, or regulation of class II gaming on the Indian lands within the tribe's jurisdiction if *such ordinance or resolution* provides that —
>
>> (A) . . . . the Indian tribe will have the *sole proprietary interest* and responsibility for the conduct of any gaming activity . . .

On appeal Harrah's argues that NGV's agreement with the Tribe violated that statute because the terms of the Lease allowed NGV to assume the dominant equity interest in the eventual gaming facility. That arrangement, it contends, is concomitant to NGV having a "sole proprietary interest" in the gaming facility.

[13] But Section 2710's plain language refutes that notion because Harrah's conclusion rests on a false premise. Here there was no "tribal ordinance or resolution" (note that the statute's implementing regulations likewise refer to "gaming ordinance or resolution *adopted by a tribe*" (see 25 C.F.R. § 522.1 (emphasis added)). That language simply does not speak to *contracts* entered into between a tribe and a third party (as contrasted with tribal legislation or regulations officially enacted by the tribe). That reading is further fortified by the sharp contrast between Section 2710 and Section 2705(a), a related statute that speaks of *both* "tribal ordinances or resolutions" and a specific type of contract that a tribe may enter

into with a third party.[18] Thus the Tribe's agreement with NGV cannot be said to violate Section 2710 either.[19]

## V.  Conclusion

We first vacate the judgment in the Tribe's declaratory judgment action against NGV and dismiss that action for lack of subject matter jurisdiction. As the Tribe's contracts with both NGV and Harrah's have been rescinded, there is no "case or controversy" at issue as between the Tribe and NGV, leaving us with no federal jurisdiction on that score.

**[14]** We further hold that Section 81 requires approval by the Secretary as to only those contracts that implicate lands already held in trust by the United States for an Indian tribe. Because the contract between the Tribe and NGV did not implicate such lands, it remained valid without such approval. We further hold that the same contract also did not violate Section 2710, for that statute pertains only to tribal ordinances and resolutions, not to a tribe's agreement with a third party. All of those things being true, we reverse the judgment in Harrah's favor and remand for resolution of NGV's action against Harrah's on the merits.

---

[18]Under Sections 2705(a)(3) and (4)(emphases added) the Chairman of the Gaming Commission can:

> (3) approve *tribal ordinances or resolutions* regulating class II gaming and class III gaming as provided in section 2710 of this title; and

> (4) approve *management contracts* for class II gaming and class III gaming as provided in sections 2710(d)(9) and 2711 of this title.

[19]We note that nothing in the record indicates that the Tribe forwarded a tribal ordinance or resolution to the Gaming Commission for it to review, or even that any such ordinance or resolution existed. Instead the record reflects that the Tribe's chairperson forwarded the Lease and Cash Management Agreement to the agency.

**VACATED IN PART; REVERSED AND REMANDED IN PART.**

---

N.R. SMITH, Circuit Judge, dissenting:

I respectfully dissent for the following reasons. First, the majority rejects the clear and unambiguous will of Congress in its application of 25 U.S.C. § 81. Second, because of its error in the application of 25 U.S.C. § 81, the majority is thereafter forced to reverse the district court by (1) interpreting contracts that the district court did not review; (2) making its own determination that the contracts were unambiguous; (3) using parol evidence to interpret the contract even though it finds that the contracts were unambiguous; and (4) picking and choosing which parol evidence on which to rely, even though the district court had not addressed the issues of whether to admit parol evidence and, if so, what evidence to admit. I would instead affirm the district court's summary judgment decision dismissing NGV's tortious interference complaint against Harrah's and dismiss the appeal for declaratory relief filed by the Tribe as moot.

## I.

"The doctrine that the federal government stands in a fiduciary relationship to Native Americans has been a part of our common law since the early days of the Republic." *Eric v. Sec'y of HUD*, 464 F. Supp. 44, 46 (D. Alaska 1978) (citing *Cherokee Nation v. Georgia*, 30 U.S. (5 Pet.) 1, 8 L.Ed. 25 (1831)). "Over the years courts at all levels have sustained the doctrine that in its relations with Native peoples the government owes a special duty analogous to those of a trustee." *Id.* (citing *Heckman v. United States*, 224 U.S. 413 (1912); *Seminole Nation v. United States*, 316 U.S. 286 (1942); *Redfox v. Redfox*, 564 F.2d 361, 365 (9th Cir. 1977); *Manchester Band of Pomo Indians, Inc. v. United States*, 363 F. Supp. 1238

(N.D. Cal. 1973)). This is a "unique relationship between Indians and the federal government, a relationship that is reflected in hundreds of cases and is further made obvious by the fact that one bulging volume of the U. S. Code pertains only to Indians." *Id.* (quoting *White v. Califano*, 437 F. Supp. 543, 555 (D.S. D. 1977), *aff'd*, 581 F.2d 697 (8th Cir. 1978)).

Consistent with this special duty, Congress enacted 25 U.S.C. § 81 "to protect the Indians from improvident and unconscionable contracts" in 1872. *In re Sanborn*, 148 U.S. 222, 227 (1893). Since that time, Congress has amended § 81, removing provisions that were antiquated and unnecessary. *See* H.R. Rep. 106-501. The present language of § 81(b) states:

> No agreement or contract with an Indian tribe that encumbers Indian lands for a period of 7 or more years shall be valid unless that agreement or contract bears the approval of the Secretary of the Interior or a designee of the Secretary.

The term "Indian lands" is defined by § 81(a) as: "lands the title to which is held by the United States in trust for an Indian tribe." 25 U.S.C. § 81(a). (hereafter referred to as "trust lands"). To decide this case, we must apply § 81 to the parties' contracts.

"In interpreting a statute, we look first to the plain language of the statute, construing the provisions of the entire law, including its object and policy, to ascertain the intent of Congress." *United States v. Middleton*, 231 F.3d 1207, 1210 (9th Cir. 2000) (quoting *United States v. Mohrbacher*, 182 F.3d 1041, 1048 (9th Cir. 1999)). When a statutory term is undefined, we endeavor to give that term its ordinary meaning. *Id.* We are instructed to avoid, if possible, an interpretation that would produce "an absurd and unjust result which Congress could not have intended." *Id.* (quoting *Clinton v. City of New*

*York*, 524 U.S. 417, 429, 118 S.Ct. 2091, 141 L.Ed.2d 393 (1998)).

In the Dictionary Act, Congress mandated that, in determining the meaning of any Act of Congress, "unless the context indicates otherwise . . . words used in the present tense include the future as well as the present." 1 U.S.C. § 1. Thus, when interpreting the definition of "Indian lands" in § 81, we must read the words "which is held in trust . . ." to also include land "which will be held in trust . . . ." *Id*.

Recent Congressional discussion of the purpose of § 81 supports such a reading. Section 81 "is intended to protect Indians from improvident contracts and is concerned primarily with federal control over contracts between Indian tribes or individual Indians and non-Indians." *See* H.R. Rep. 106-501. Congress clearly does not want Indian tribes to enter into contracts that would encumber their trust lands for seven years or more, without the added protection of the Secretary of the Interior's approval. Limiting § 81's definition of Indian lands to only the present tense — land which "*is* held in trust" — undermines the protection § 81 is intended to provide to the Indian tribes. Under the majority's reading of § 81, parties can easily circumvent the statute. The parties, fully intending that their contract will encumber Indian lands for more than seven years, can simply execute their contract before the lands are conveyed into trust. Because such a contract would not pertain to land *presently* held in trust by the United States for an Indian tribe, the contract would not require the approval of the Secretary of the Interior. This would be true even though the parties always intended that the land would be held in trust by the United States for the Indian tribe and even if the contract contained an explicit provision requiring that the land be held in trust by the United States for the Indian tribe.

Longstanding Supreme Court and Ninth Circuit precedent concerning the regulation of Indian land transactions also supports reading § 81 to include the future tense. The United

States Supreme Court has made clear that "the canons of construction applicable to Indian law are rooted in the unique trust relationship between the United States and the Indians." *Oneida County v. Oneida Indian Nation*, 470 U.S. 226, 247 (1985). One of those cannons of construction is that federal statutes relating to Indian tribes must be "construed liberally in favor of the Indians." *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766 (1985). This court has previously written, "Until Congress repeals or amends the Indian . . . statutes . . . we must give them a 'sweep as broad as [their] language' and interpret them in light of the intent of the Congress that enacted them." *A.K. Management Co. v. San Manuel Band of Mission Indians*, 789 F.2d 785, 787 (9th Cir. 1986) (quoting *Central Machinery Co. v. Arizona State Tax Commission*, 448 U.S. 160, 166 (1980)). Reading § 81 to include the future tense furthers both the intent of Congress and the direction of the Supreme Court that we must construe statutes broadly in favor of the Indian tribes.

Applying the plain language of § 81 to the contract between the Tribe and NGV is a straightforward exercise. The Tribe and NGV entered into contracts regarding lands which are or will be held in trust for seven or more years. Based upon the provisions of § 81, the Tribe applied for approval of these contracts. However, the Secretary of the Interior did not approve the contracts. Thus, under the plain language of § 81, they are invalid. 25 U.S.C. § 81. Because the contracts are invalid, NGV cannot establish the first element of its tortious interference cause of action against Harrah's. *Quelimane Co. v. Stewart Title Guaranty Co.*, 960 P.2d 513, 530 (Cal. 1998) (stating that the first element of an intentional interference with contractual relations action is "a valid contract between plaintiff and a third party").

To contradict this clear and unambiguous reading of § 81, the majority first declares that the Dictionary Act only applies when a statute is ambiguous. However, the majority cites no authority for this argument, because there is none. Congress

enacted the Dictionary Act and installed it as its first act, 1 U.S.C. § 1, controlling the meaning of the words of any and all Acts of Congress. Nothing in the United States Code or controlling precedent limits the Dictionary Act's application.

Understanding the weakness of their argument, the majority next seizes upon the language of the Dictionary Act and argues that the context of the § 81 precludes the use of the future tense. Context is "the text of the Act of Congress surrounding the word at issue, or the texts of other related congressional Acts." *Rowland v. California Men's Colony*, 506 U.S. 194, 199 (1993). However, the words of § 81 do not provide a different context. There is no finding in the majority opinion or arguments in the briefs of the parties suggesting that the words of the statute surrounding "which is held" provide a different context. Instead, the majority suggests that 25 U.S.C. §§ 465, 2710, and 2719 (other congressional acts) provide the "context" to reject reading § 81 to include the future tense, as mandated by the Dictionary Act. Again, the majority cites no Supreme Court or circuit precedent to buttress their argument that these sections were enacted to change the context of § 81.

The sections cited by the majority provide additional protections to the Indian tribes and their lands, but provide no support for the proposition that the Dictionary Act should not apply to § 81. However, Congress can pass more than one Act to assist Indian tribes. Section 81 applies to all contracts and agreements with Indian tribes which encumber Indian trust lands. Under § 81, the Secretary must determine: (1) whether the contract will encumber presently held or to be acquired trust land for a period of seven or more years; and (2) whether the contract is improvident and unconscionable. 25 U.S.C. § 81. None of the language in sections 465, 2710, or 2719 even addresses contracts encumbering Indian lands, much less provides a context suggesting that § 81 can include only the present tense.

Section 465 authorizes the Secretary "to acquire . . . any interest in lands, water rights, or surface rights to lands within or without existing reservations . . . for the purposes of providing land for Indians." 25 U.S.C. § 465. Nothing in that section even remotely addresses determining the fairness of contracts, between Indian tribes and some other party, which will encumber Indian lands. *Id.*; *see also* 25 C.F.R. §§ 151.10, 151.11. Section 2701 *et seq.*, which includes § 2710, applies to the approval of gaming contracts, not contracts encumbering Indian lands. Additionally, these sections use a different definition of the term "Indian Lands" than does § 81. Indian lands under these sections includes "all lands within the limits of any Indian reservation *and* any lands to which title is either held in trust by the United States . . . or held by any Indian tribe or individual subject to restrictions by the United States . . . over which an Indian tribe exercises governmental power." 25 U.S.C. § 2703(4) (emphasis added). Section 2719(b)(1)(A) is likewise limited to gaming contracts, and requires the Secretary to determine whether a gaming establishment would be in the best interest of the Indian tribe and whether it would be detrimental to the surrounding community. 25 U.S.C. § 2719(b)(1)(A).

The majority next argues that Congress could have drafted § 81 to include the future tense, if that were its intent. However, the Dictionary Act provides that all present tense words used in Acts of Congress include the future tense. *See* 1 U.S.C. § 1. Because we presume that Congress is knowledgeable about existing law when it passes new legislation, we must presume that Congress was aware of the Dictionary Act when it enacted § 81. *See Miles v. Apex Marine Corp.*, 498 U.S. 19, 32 (1990). Thus, there is simply no reason for Congress to draft a statute with language in both present and future tense. In fact, drafting in this way would be illogical given that the Dictionary Act already addresses the future tense in "any Act of Congress." 1 U.S.C. § 1.

The majority's opinion also implies that the statutory language in the Dictionary Act is hoary, because the Supreme

Court has only applied the Dictionary Act to illustrate the meaning of the word "person." Acts of Congress, however, are not presumed invalid until declared so by the Supreme Court. Simply because the Supreme Court has not yet addressed this issue does not affect the application of the Dictionary Act to the facts of this case.

Lastly, the majority relies on what it terms a "more modern attitude toward Indian tribes" to justify its reading of § 81. However, our job is not to legislate to reflect modern attitudes. Our job is, instead to interpret statutes as they have been written. It is Congress's place, not ours, to decide whether modern attitudes dictate that § 81 be repealed (as this opinion does). Until the time that Congress does so, we are bound by the current language of § 81.

The contracts between the Tribe and NGV are subject to § 81 and require approval by the Secretary of the Interior. Because the contracts were not approved, the contracts were invalid and unenforceable. NGV's tortious interference cause of action therefore fails and must be dismissed.

## II.

The Tribe and Harrah's filed summary judgment motions, asserting that the language of the contracts between the Tribe and NGV encumbered presently owned trust lands thereby requiring Secretary approval under § 81. NGV opposed the motion, also citing the language of the contracts. Thereafter, NGV requested permission to file a surreply to provide the court with additional evidence in support of its position that the contracts did not encumber trust lands. Both Harrah's and the Tribe opposed the motion and, alternatively, requested that they be able to respond to NGV's surreply, if it were allowed. The district court refused to allow the surreply. However in its refusal, the district court noted, "The Court has reviewed the surreply filed by NGV. The Court finds that NGV has submitted evidence concerning issues of fact.

Because the Court bases its decision on an issue of law, it finds it unnecessary to address the contentions contained in the surreply." *Guidiville Band of Pomo Indians v. NGV Gaming Ltd.*, 2005 WL 5503031 at 1, n.1 (N.D. Cal. 2005). Given these circumstances, it is error for this court to pick and choose what parol evidence it will use in reversing the district court's decision on an issue that the district court did not even address. Instead, we should remand this issue to the district court so that it may make a factual finding regarding whether the terms of the contracts between the Tribe and NGV are ambiguous.

## A.

In interpreting a contract under California law, a court must first look to the plain meaning of the contract's language. *See* Cal. Civ. Code §§ 1638, 1644. "When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible[.]" Cal. Civ. Code § 1639. California law holds that "even if the trial court personally finds the document not to be ambiguous, it should preliminarily consider all credible evidence to ascertain the intent of the parties." *Appleton v. Waessil*, 32 Cal. Rptr. 2d 676, 678 (Cal. Ct. App. 1994). In such cases, the district court engages in a two-step process: "First, the court provisionally receives (without actually admitting) all credible evidence concerning the parties' intentions to determine 'ambiguity,' i.e., whether the language is 'reasonably susceptible' to the interpretation urged by a party. If in light of the extrinsic evidence the court decides the language is 'reasonably susceptible' to the interpretation urged, the extrinsic evidence is then admitted to aid in the second step-interpreting the contract." *Winet v. Price*, 6 Cal. Rptr. 2d 554, 557 (Cal. Ct. App. 1992).

The district court had no opportunity to interpret the language of these contracts. Instead, it decided a question of law regarding § 81. Because the district court acknowledged that factual issues exist with regard to the contracts' interpretation,

the district court is in a better position to "make these determinations in the first instance." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

Notwithstanding that the district court never reached the analysis set forth in *Winet*, the majority finds that the language of the Tribe/NGV Lease is unambiguous. However, in doing so, the majority picks and chooses what parol evidence it will consider rather than remanding to the district court so that it may determine, in the first instance, whether the terms of the contract are ambiguous. For example, the majority uses parol evidence to (1) ascertain that neither of the parties ever contemplated that the Lease would extend to already owned trust land (the Medocino County property); and (2) state that "equally unambiguous facts as to that property itself confirm that the Medocino County lands are not at all within the purview of the parties' transaction." The majority also cites to the Bureau of Indian Affairs letters to buttress its finding regarding the language of the Lease.

I reject the idea that appellate courts may rely upon parol evidence which was not fully presented by the parties to the district court in order to reverse the district court. An appellate court's application of parol evidence to interpret contractual terms is not a substitute for a full hearing before the district court in which the district court can consider all of the evidence. This is particularly true under California law, which requires a district court to first make a finding about whether the contract is ambiguous and allows the admission of parol evidence only if the contract is, in fact, ambiguous. *See Winet*, 6 Cal. Rptr. 2d at 557. If the contract is unambiguous, an appellate court should interpret the contract based on its language alone. Cal. Civ. Code § 1639. It is not appropriate for appellate courts to make a determination in the first instance about whether the contract is ambiguous and it is even less appropriate for appellate courts to determine what parol evidence, if any, to consider. Therefore, I would remand to the district court for it to make a determination in the first

instance as to whether the contracts between the Tribe and NGV are ambiguous, and, if so, what parol evidence to admit. This is consistent with the process provided for by California law. *See Winet*, 6 Cal. Rptr. 2d at 557; *Pacific Gas & E. Co. v. G.W. Thomas Drayage etc. Co.*, 442 P.2d 641, 644 (Cal. 1968) ("The test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible.")

### B.

The majority also ignores the rules of contract interpretation in reaching its result. Section 81's plain language requires any contract encumbering Indian lands for a period of seven years or more to get approval. 25 U.S.C. § 1. There is no dispute that the Lease "encumbers" land which the lease defines as "Trust Lands." *See* 25 C.F.R. § 84.002 ("Encumber means to attach a claim, lien, right of entry or liability to real property"). Pursuant to the terms of the Lease, so long as any of the Tribe's obligations to NGV remain outstanding, the Tribe cannot sell, dispose of, lease, assign, sublet, transfer, mortgage or encumber all or any part of its title, or interest in or to the "Trust Lands," as defined in the parties' contracts, without the prior written consent of NGV. The Lease also grants NGV, its agents, employees, and independent contractors a right of entry on Indian trust lands, with "complete and unrestricted access . . . for purposes of developing, installing and constructing the Structure." Thus, we must determine whether the defined term "Trust Lands" used in the Lease encompasses Indian lands such that § 81's approval requirement would apply.

In the parties' Master Definitions List, which applies to both the Lease and the parties' other contract, the parties defined the term "Trust Lands" as "Property held by the

United States in Trust for the benefit of the Tribe." Applying § 81 to this definition, the Lease encumbers Indian lands. The Lease's definition of "Trust Lands" includes all of the property held by the United States in trust for the benefit of the Tribe, with no exceptions. Thus, even if the majority is correct that § 81 only applies to lands *presently* held in trust, the Lease encumbers such land. Thus, the Lease needed to be approved by the Secretary of the Interior. 25 U.S.C. § 81(b). Because it was not, the Lease is invalid.

The majority attempts to skirt § 81's approval requirement by suggesting that the Lease's definition of "Trust Lands" only applies to property which will be acquired in the future. The majority asserts that the sequence in which terms are defined in the Master Definitions List makes it clear that the use of the word "Property" in the definition of "Trust Lands" is limited to the defined term "Property," which is also included in the Master Definitions List. Thus, the majority believes that the term "Trust Lands" includes only the specific land to be acquired for construction of the casino. The majority relies upon the fact that the word "Property" is capitalized in the definition of "Trust Lands," but ignores the context and use of the term "Trust Lands" within the contracts themselves.

It is well settled that a contract should be interpreted so as to give meaning to each of its provisions. "Since an agreement is interpreted as a whole, it is assumed in the first instance that no part of it is superfluous." *Brinderson-Newberg Joint Venture v. Pacific Erectors, Inc.*, 971 F.2d 272, 278-79 (9th Cir. 1992) (quoting Restatement (Second) of Contracts § 203(a) cmt. b (1979)). The majority's reading of the Lease renders the defined term "Trust Lands" meaningless. The defined term "Property" includes "real property upon which the Structure will be constructed by Developer, which at the time of construction will be titled to the United States in trust for the benefit of the Tribe." This term already requires that the land acquired for the casino be held in trust by the United States for the Tribe. The defined term "Trust

Lands" includes "Property held by the United States in Trust for the benefit of the Tribe." If this definition only refers to "Property" as defined by the Master Definitions List, the two terms mean exactly the same thing. Thus, the term "Trust Lands" would be superfluous because it would not include any land not already covered by the definition of "Property."

Additionally, contracts should be interpreted to be "internally consistent." *Brobeck, Phleger & Harrison v. Telex Corp.*, 602 F.2d 866, 872 (9th Cir. 1979) (applying California law). When the contract is unambiguous, the express language is to govern. *Oracle Corp. v. Falotti*, 319 F.3d 1106, 1112 (9th Cir. 2003) (citing California law).

The majority reads only the Master Definitions List to determine what the term "Trust Lands" means, and ignores the plain language of the whole Lease, thereby making it "internally inconsistent." First, the majority overlooks the fact that the first letter of every definition in the Master Definitions List is capitalized. Thus, the fact that "Property" is capitalized in the definition of "Trust Lands" has no significance. Neither the Lease nor the parties' other contract has language indicating that the word "Property," the first word of the definition of "Trust Lands," refers only to the term as defined previously in the contracts. At best, the majority's reading of this language suggests an ambiguity in the contracts. An ambiguous contract cannot be interpreted without determining the intent of the parties. If this is the case, the matter should be remanded to the district court for such a determination.

Second, the majority ignores the remainder of the Lease, which makes clear that the term "Trust Lands" is not limited to property to be acquired in the future, and thus triggers the application of § 81. For example, section 14.1 of the Lease provides that the Tribe represents and warrants:

> F.   There are no judgments filed or suits, actions, or proceedings pending, or to the knowledge of Lessee,

threatened against or affecting the Lessee or the Trust Lands or by any court, arbitrator, administrative agency, or other Governmental Authority which, if adversely determined, would materially and adversely affect the construction, development, or operation of the facility as contemplated in the Transaction Documents.

It would be internally inconsistent to apply the majority's definition of "Trust Lands" to this provision. If the words "Trust Lands" refer only to yet to be acquired property on which the casino will be built, this paragraph is superfluous. The Tribe could not realistically make any of the required representations or warranties on land it had not yet acquired. Thus, at the time the Tribe and NGV entered into their contracts, section 14.1 of the Lease would have been meaningless.

Applying basic rules of statutory interpretation, the Lease clearly contemplates that the definition of "Trust Lands" includes *any* trust land of the Tribe, not just the property to be acquired for the Tribe by NGV in the future. Thus, the parties' contracts were undisputedly subject to approval by the Secretary of the Interior under § 81.

### III.

The Tribe also brought a declaratory judgment action to determine the validity of its contracts with NGV. The district court found that (1) it had subject matter jurisdiction over the declaratory relief action; (2) § 81 applied to the to-be-acquired trust lands; and (3) because the Secretary of the Interior did not approve the contracts as required under § 81, the contracts were invalid. NGV appealed that decision.

As noted in the majority opinion, the Tribe entered into contracts with Harrah's after entering into the contracts with NGV. In the Harrah's/Tribe contracts, the Tribe specifically

indemnified Harrah's against any lawsuit by NGV. While the appeal was pending, the Tribe and Harrah's terminated their contracts and entered into a settlement agreement, wherein the Tribe agreed to continue to indemnify Harrah's against claims made by NGV. Based upon the termination and settlement, NGV on appeal asserts an additional argument, alleging that the declaratory judgment is moot (no case or controversy exists) because of the termination of the contracts. The majority agrees, because (1) the contracts between the Tribe and Harrah's were terminated; and (2) the underlying contracts between the Tribe and Harrah's were invalid because they were never approved. Although the Tribe entered into a settlement agreement, which required the Tribe to continue to indemnify Harrah's, the majority found that the settlement agreement was void for lack of consideration. I again disagree with the majority.

The parities dispute whether the Tribe's obligation to indemnify Harrah's survived the termination of the contracts, and therefore whether a case and controversy existed or continues to exist. Both the Management Agreement and the Development Agreement between Harrah's and the Tribe contained an indemnification clause. The clause states:

> ***Indemnity.*** To the fullest extent permitted by law, the Tribe shall indemnify Developer and its Affiliates against any claims relating to the development, management, or operation of the Casino of the Tribe by any person, . . . with which or whom the Tribe has had any business relationship, association, or dealing prior to the date hereof. This indemnification shall survive the termination of this Agreement for a period of three (3) years.

In addition, both of the contracts contained a severability clause stating in part:

> ***Severability.*** If any of the material terms and provisions hereof shall be held invalid or unenforceable,

such invalidity or unenforceability shall not affect any of the other terms or provisions hereof.

Based upon the language in foregoing clauses in the contracts, there is a question of fact as to whether the termination of the contracts ended the Tribe's obligations to indemnify Harrah's. Even if the language in the contracts is not applicable, California law provides that:

the compromise of a doubtful claim asserted and maintained in good faith constitutes a sufficient consideration for a new promise, even though it may ultimately be found that the claimant could not have prevailed. This is true whether the claim be in suit or not . . .

*Union Collection Co. v. Buckman*, 88 P. 708, 710 (Cal. 1907).

California law further provides that partially illegal contracts may be upheld if the illegal portion is severable from the part which is legal. *Mailand v. Burckle*, 572 P.2d 1142, 1152 (Cal. 1978) (severing a contract void under the Cartwright Act). The issue of "whether a contract is entire or whether its various stipulations are to be regarded as severable is a question of construction." *Sterling v. Gregory*, 85 P. 305, 306 (Cal. 1906). Thus, to determine whether provisions of otherwise illegal contracts have continued vitality, a court must examine "the language and subject-matter of the contract . . . according to the intention of the parties." *Pac. Wharf & Storage Co. v. Standard Am. Dredging Co.*, 192 P. 847, 849 (Cal. 1920). In determining the parties' intent, the court must consider "all the circumstances surrounding the making of the contract." *Sterling*, 85 P. at 306.

Because issues of fact have been raised with regard to the effect of the settlement and the validity of the Tribe/Harrah's contracts, "we must remand to the district court to conduct, as necessary, further evidentiary proceedings to resolve those

issues." *Bank of New York v. Fremont Gen. Corp.*, 523 F.3d 902, 910 (9th Cir. 2008).