**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

BIG LAGOON RANCHERIA, a
federally recognized Indian tribe,
*Plaintiff-Appellee–*
*Cross-Appellant*,

v.

STATE OF CALIFORNIA,
*Defendant-Appellant–*
*Cross-Appellee.*

Nos. 10-17803
10-17878

D.C. No.
4:09-CV-01471-
CW

OPINION

Appeal from the United States District Court
for the Northern District of California
Claudia Wilken, District Judge, Presiding

Argued and Submitted
December 6, 2012—San Francisco, California

Filed January 21, 2014

Before: Stephen S. Trott and Johnnie B. Rawlinson,
Circuit Judges, and Frederic Block, District Judge.[*]

Opinion by Judge Block;
Dissent by Judge Rawlinson

---

[*] The Honorable Frederic Block, Senior United States District Judge for
the Eastern District of New York, sitting by designation.

## SUMMARY[**]

### Indian Gaming Regulatory Act

Reversing the district court's summary judgment, the panel held that the State of California did not violate the Indian Gaming Regulatory Act by failing to negotiate in good faith for a tribal-state gaming compact with Big Lagoon Rancheria.

The panel held that a tribe must have jurisdiction over "Indian lands" in order to file suit to compel negotiations under IGRA. Specifically, the tribe must have jurisdiction over the Indian lands upon which the gaming activity is to be conducted.

The panel held that although the State's objection to the "Indian lands" requirement could be waived because it was not a matter of subject matter jurisdiction, the State preserved this issue for review.

The panel held that the parcel at issue was not Indian lands, which include lands held in trust for a tribe, because under *Carcieri v. Salazar*, 555 U.S. 379 (2009), the Bureau of Indian Affairs' authority to take lands in trust for a tribe extends only to tribes under federal jurisdiction in 1934. Because Big Lagoon was not such a tribe, the BIA lacked authority to purchase the parcel in trust for Big Lagoon in 1994. Accordingly, Big Lagoon could not demand negotiations to conduct gaming on the parcel, and it could not

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

sue to compel negotiations if the State fails to negotiate in good faith.

Dissenting, Judge Rawlinson wrote that the parcel was Indian lands under IGRA because under *Guidiville Band of Pomo Indians v. NGV Gaming*, 531 F.3d 767 (9th Cir. 2008), the State could not collaterally attack the BIA's designation of trust lands years after its administrative and legal remedies had expired.

---

## COUNSEL

Peter H. Kaufman (argued) and Randall A. Pinal, Deputy Attorneys General, San Diego, California, for Defendant-Appellant–Cross-Appellee.

Peter J. Engstrom, Baker & McKenzie LLP, San Francisco, California, for Plaintiff-Appellee–Cross-Appellant.

---

## OPINION

BLOCK, District Judge:

The State of California ("the State") has entered into an agreement allowing Big Lagoon Rancheria ("Big Lagoon") to operate a casino on an eleven-acre parcel of land in Humboldt County, California. It did so, however, only because the district court ordered it to negotiate with Big Lagoon under the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. §§ 2701–2721. The State appeals that order and, for the following reasons, we reverse.

I

A.  Historical Background and *Carcieri*

Big Lagoon is situated on two parcels of land along the shore of the eponymous lagoon in Northern California.  The eleven-acre parcel on which Big Lagoon proposes to operate a casino was acquired by the United States, acting through the Bureau of Indian Affairs ("BIA"), in 1994.[1]  However, to understand the background of the case, we must go further back in time to 1918, when the BIA purchased another parcel—a nine-acre tract adjacent to the eleven-acre parcel—as a homestead for James Charley and his family.  According to contemporaneous BIA records, the purchase was paid out of an appropriation "to purchase land for village homes for the landless Indians of California."

By 1921, Charley had died and his widow had moved, with their children, to Trinidad, California.  Charley's son Robert may have lived on the nine-acre parcel from 1942 to 1946, but the land was otherwise vacant for more than 30 years.  In 1954 or thereabouts, Thomas Williams—Robert's nephew by marriage—and his wife, Lila, received the BIA's permission to camp on the land, but made no claim to ownership.

The 1950s ushered in a major change in Indian policy, from isolation to assimilation.  As part of the change, the federal government moved to dissolve reservations and other tribal entities and distribute their lands to individual tribe

---

[1] The BIA is part of the Department of the Interior.  In this case, there is no meaningful distinction between the two.  We therefore use "BIA" to refer to the bureau, its agency, and the agency's secretary.

members.  The policy came to California with the enactment of the California Rancheria Termination Act, Pub. L. No. 85-671, 72 Stat. 619, in 1958.  The Act mandatorily dissolved some 43 rancherias—the term for small Indian settlements in California—although some were later restored.  *See Tillie Hardwick v. United States*, No. 79-1710 (N.D. Cal. stipulated judgment entered 1983).  A 1964 amendment to the Act allowed any rancheria to request dissolution and distribution. *See* Pub. L. No. 88-419, 78 Stat. 390.

The Williamses apparently came to consider the nine-acre parcel a rancheria because they applied for dissolution and distribution in 1967.  A 1968 BIA memorandum, by contrast, notes that the parcel "was not set aside for any specific tribe, band or group of Indians" when it was acquired in 1918.  It further notes that the occupants "have not formally organized" and did not have "allotments or formal assignments."  The BIA nevertheless approved distribution to the Williamses and their daughter and son-in-law—who were also living on the land—in 1968.

The proposed distribution never took place because, for reasons unknown, the Williamses withdrew their request.  But the 1968 distribution list forms the basis for membership in Big Lagoon as it exists today.  The tribe first appeared on a 1979 list of "Indian Tribal Entities That Have a Government-to-government Relationship With the United States." 44 Fed. Reg. 7325 (Feb. 6, 1979).  It has consistently appeared on similar lists since.  *See, e.g.*, 78 Fed. Reg. 26384-02 (May 6, 2013) ("Indian Entities Recognized and Eligible to Receive Services From the United States Bureau of Indian Affairs"). Its roughly two dozen members trace their ancestry, not to Charley, but to his son's wife's nephew.

As noted, the BIA purchased the eleven-acre parcel in 1994.  It took the land "in Trust for Big Lagoon Rancheria, a Federally Recognized Indian Rancheria" pursuant to 25 U.S.C. § 2202.  That statute, in turn, is based on 25 U.S.C. § 465, which authorizes the BIA to acquire land "for the purpose of providing lands to Indians."  Title is "taken in the name of the United States in trust for the Indian tribe or individual Indian for which the land is acquired."  *Id.*

Section 465 was enacted as part of the Indian Reorganization Act of 1934 ("IRA"), ch. 576, 48 Stat. 985. Another section of the IRA defines "Indian" as including

> all persons of Indian descent who are members of any recognized Indian tribe now under Federal jurisdiction, and all persons who are descendants of such members who were, on June 1, 1934, residing within the present boundaries of any Indian reservation, and . . . all other persons of one-half or more Indian blood.

*Id.* § 19, 48 Stat. 988 (codified at 25 U.S.C. § 479).

In *Carcieri v. Salazar*, 555 U.S. 379 (2009), the Supreme Court held that the phrase "now under Federal jurisdiction" "unambiguously refers to those tribes that were under the federal jurisdiction of the United States when the IRA was enacted in 1934."  *Id.* at 395.  Thus, under *Carcieri*, the BIA lacks authority to acquire land in trust for tribes that were not under federal jurisdiction in 1934.  *See id.* at 388 ("[T]he Secretary's authority to take the parcel in question into trust

depends on whether the Narragansetts are members of a 'recognized Indian Tribe now under Federal jurisdiction.'").[2]

## B.  Indian Gaming and IGRA

Beginning in the 1970s, the State and several Indian tribes came into conflict over the operation of bingo halls on Indian lands.  The conflict culminated in *California v. Cabazon Band of Mission Indians*, 480 U.S. 202 (1987), in which the Supreme Court held that state regulation of gaming on Indian lands "would impermissibly infringe on tribal government." *Id.* at 222.

Congress responded by enacting IGRA, which assigns authority to regulate gaming to tribal and state governments according to the class of gaming involved.  "Class III" gaming—which includes the casino-type gambling at issue here—is allowed on Indian lands only if "conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the State." 25 U.S.C. § 2710(d)(1)(C).  Such compacts are the result of negotiations requested by the "Indian tribe having jurisdiction over the Indian lands upon which a class III gaming activity is being conducted, or is to be conducted." *Id.* § 2710(d)(3)(A).  "Upon receiving such a request, the State shall negotiate with the Indian tribe in good faith to enter into such a compact." *Id.*

---

[2] The Court rejected the argument that § 2202, cited above, is an independent grant of authority to acquire land:  "Rather, § 2202 by its terms simply ensures that tribes may benefit from § 465 even if they opted out of the IRA pursuant to § 478, which allowed tribal members to reject the application of the IRA to their tribe." *Carcieri*, 555 U.S. at 394.

If negotiations are successful, the resulting compact goes to the BIA for approval. *See id.* § 2710(d)(3)(B). If not, the tribe may sue in the district court. *See id.* § 2710(d)(7)(A)(i). If the district court concludes that the State has failed to negotiate in good faith, it must order the parties to reach an agreement. *See id.* § 2710(d)(7)(B)(iii). If no agreement is reached after 60 days, the court orders each party to submit a proposed compact to a court-appointed mediator, who selects "the one which best comports with the terms of [IGRA] and any other applicable Federal law and with the findings and order of the court." *Id.* § 2710(d)(7)(B)(iv). If the State is unwilling to accept the mediator's selection, the matter is referred to the BIA, which must then develop procedures "under which class III gaming may be conducted on the Indian lands over which the Indian tribe has jurisdiction." *Id.* § 2710(d)(7)(B)(vii)(II).

A unifying thread running through the statutory provisions relating to class III gaming is the concept of "Indian lands." Such lands are where the gaming activities are to take place and it is the tribe "having jurisdiction" over those lands that requests negotiations and, if necessary, institutes legal action. IGRA defines "Indian lands" as

> (A) all lands within the limits of any Indian reservation; and
>
> (B) any lands title to which is . . . held in trust by the United States for the benefit of any Indian tribe or individual . . . and over which an Indian tribe exercises governmental power.

*Id.* § 2703(4).

C.  Negotiation History

In 1998 and 1999, the State proposed a model compact to tribes seeking to offer class III gaming on their lands, including Big Lagoon.  Most tribes accepted the State's model compact; Big Lagoon did not.  Instead, it filed suit in the district court, alleging that the State had failed to negotiate in good faith under IGRA.

As the litigation proceeded, the State and Big Lagoon continued to negotiate in an effort to reach a mutually acceptable agreement.  Those negotiations bore fruit in 2005, when the parties agreed that Big Lagoon, along with another group, would be allowed to operate a casino on non-Indian lands in Barstow.  As part of the settlement, the lawsuit was dismissed without prejudice.

The settlement proved illusory, however, because the California Legislature did not ratify the agreement, as required by state law.  The so-called Barstow Compact lapsed by its own terms in September 2007.

On September 18, 2007, Big Lagoon sent the State a written request for new negotiations "for the purpose of entering into a Tribal-State compact governing the conduct of Class III gaming activities on the trust lands that constitute the Big Lagoon Rancheria."  A principal point of contention that arose during the resultant negotiations concerned the site of the casino.  The State was reluctant to allow the casino to be built near the "environmentally significant State resources located adjacent to the rancheria."

The State ranked its siting preferences as follows:

1.  locating a 500-device casino and a 100-room hotel on a site approximately five miles from the rancheria;

2.  locating a 250-device casino on the nine-acre parcel, a 50-room hotel on the eleven-acre parcel, and parking on a separate parcel owned by Big Lagoon; and

3.  locating a 175-device casino on the nine-acre parcel, a 50-room hotel on the eleven-acre parcel, and dividing parking between the two parcels.

The State conditioned the second and third options on compliance with a list of environmental mitigation measures. In addition, all three options included a proviso that Big Lagoon would share a percentage of its revenue with the State in exchange for an exclusive right to operate a casino within a 50-mile radius.

Big Lagoon responded that "possible sites other than the Tribe's existing trust lands would have to be rejected." It noted that it had always planned to site the casino and all related development on the eleven-acre parcel, and that it "continue[d] to believe that this is the best utilization of the Tribe's trust lands."

In its response, the State reiterated the parties' "difference of opinion on the eligibility of the 11-acre parcel for gaming." It apparently acquiesced in Big Lagoon's demand to site all development on that parcel, but proposed a 99-device casino and 50-room hotel. The State's proposal was again

conditioned on compliance with environmental mitigation measures, as well as revenue sharing.

Big Lagoon rejected the proposal. In a letter dated October 6, 2008, it demanded permission to operate a 350-device casino and 100-room hotel on the eleven-acre parcel. It agreed in principle to environmental mitigation measures, but, with respect to revenue sharing, refused "to pay the State what simply amounts to a tax." It informed the State that it would file suit if an agreement was not reached by November 7.

In response, the State agreed to allow Big Lagoon to operate a casino and hotel "on the Rancheria," without distinguishing between the nine-acre and eleven-acre parcels. Although it acquiesced in the size of both the proposed casino and hotel, it objected to housing them in a tower of the height proposed by Big Lagoon. The State also continued to insist on revenue sharing, as well as specific environmental measures.

D.  Litigation History

Apparently unsatisfied with the State's latest offer, Big Lagoon filed a second lawsuit on April 3, 2009. In its answer, the State admitted that "Big Lagoon is currently on a list of federally recognized tribes, [and] that the United States considers the Rancheria to be the trust beneficiary of certain lands the federal government owns in Humboldt County, California." As an "affirmative defense," however, it alleged that

> Big Lagoon is not entitled to injunctive relief compelling Governor Arnold Schwarzenegger

> to negotiate a Compact authorizing class III
> gaming on land taken in trust for the
> Rancheria subsequent to October 17, 1988,
> because Big Lagoon is not eligible to be a
> beneficiary of a trust conveyance pursuant to
> 25 U.S.C. § 465 and, thus, was never entitled
> to a beneficial interest in that land.

After discovery, both Big Lagoon and the State moved for summary judgment. In its memorandum of law, the State argued, *inter alia*, that "[i]t is against the public interest to allow gaming on land that . . . the United States unlawfully acquired in trust for [Big Lagoon]." Citing *Carcieri*, it argued that the eleven-acre parcel was "not 'Indian lands' eligible for gaming under IGRA" because Big Lagoon was not a tribe under federal jurisdiction in 1934. As an alternative to entering summary judgment in its favor, the State asked the district court to deny or continue Big Lagoon's motion pending further discovery pursuant to Federal Rule of Civil Procedure 56(f) (now Federal Rule of Civil Procedure 56(d)).

At oral argument on the motions, the district court opined that the status of the eleven-acre parcel was an issue separate from the State's obligation to negotiate in good faith: "Whether it's in the public interest or not, it might not be legal." In addition, the State conceded that it was not challenging the status of the nine-acre parcel.

In a decision dated November 22, 2010, the district court held that the State had not, as a matter of law, negotiated in good faith. It addressed the status of the eleven-acre parcel as both bearing on the good faith of the State's negotiation position and as a stand-alone issue. With respect to good

faith, the district court  reasoned that the State could not rely on *Carcieri* as evidence of its good faith because the case post-dated the negotiations: "The State cannot establish that it negotiated in good faith through a *post hoc* rationalization of its actions."  As a stand-alone issue, it concluded that the status of the eleven-acre parcel was irrelevant:

> [T]he State does not dispute that [Big Lagoon] is currently recognized by the federal government or that it has lands on which gaming activity could be conducted.  On these facts, [Big Lagoon] is entitled to good faith negotiation with the State toward a gaming compact.  That the status of the eleven-acre parcel may be in question does not change this result.

The district court also addressed the State's proposal for revenue sharing.  In so doing, it cited *Rincon Band of Luiseño Mission Indians v. Schwarzenegger*, 602 F.3d 1019 (9th Cir. 2010), in which we held that "a state may, without acting in bad faith, request revenue sharing *if* the revenue sharing provision is (a) for uses 'directly related to the operation of gaming activities' . . . , (b) consistent with the purposes of IGRA, and (c) not 'imposed' because it is bargained for in exchange for a 'meaningful concession.'"  *Id.* at 1033 (quoting *In re Indian Gaming Related Cases*, 331 F.3d 1094 (9th Cir. 2003))."  The district court extended the reasoning of *Rincon* to the State's proposal for environmental mitigation.  It concluded that both revenue sharing and environmental mitigation could be appropriate topics of negotiation under the circumstances described in *Rincon*, but that the State's nonnegotiable insistence on them amounted to bad faith.

Implementing its rulings, the district court granted Big Lagoon's motion for summary judgment and denied the State's. It denied the State's request for a Rule 56(f) continuance because "the status of [Big Lagoon] and its eleven-acre parcel has no bearing on whether the State negotiated in good faith." It ordered the parties to either conclude a compact within 60 days, or to submit their respective proposals to a court-appointed mediator. Both the State and Big Lagoon timely appealed.[3]

The district court initially declined to stay its order pending appeal. Accordingly, the parties continued to negotiate. Unable to reach an agreement, they submitted their last, best proposals to a mediator. In its proposal, the State agreed to forgo all revenue sharing if Big Lagoon would agree to comply with specified environmental mitigation measures. Big Lagoon, on the other hand, offered to prepare a non-binding environmental impact report and to negotiate towards an environmental mitigation agreement with the appropriate agency. It also agreed to contribute revenue to gaming-related trust funds.

Apart from revenue sharing and environmental mitigation, both proposals were substantially similar. In particular, both identified the site of the casino as "within the boundaries of the Tribe's eligible Indian lands." Although that language does not specify the nine-acre or eleven-acre parcel, nothing in the record suggests that Big Lagoon has altered its plan to build the casino on the latter.

---

[3] The district court's order was reduced to judgment on February 1, 2012, thus remedying any possible concern that the notices of appeal were premature. *See* Fed. R. App. P. 4(a)(2).

The mediator found that "[i]n light of the stringent, broad, and very substantial environmental and design requirements" in the State' proposal, "the compact that best comports with the terms of IGRA, applicable federal law, and [the district court's order] is clearly [Big Lagoon's]."  The district court then stayed further proceedings.

## II

We review the district court's summary judgment *de novo*, "and must determine whether, viewing the evidence in the light most favorable to the nonmoving party, there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law."  *Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir. 2000) (en banc).  The State challenges only the district court's legal conclusion that Big Lagoon was entitled to good-faith negotiation under IGRA, and we confine our review accordingly.

In essence, the State argues that the district court erred in compelling negotiations in the face of evidence that the eleven-acre parcel does not qualify as "Indian lands" under IGRA.  It raises the issue principally as a question of whether the district court should have given it more time to develop the facts supporting that argument.  Big Lagoon responds that the district court did not abuse its discretion in that regard because the State had ample time to conduct discovery.

In our view, there is more at stake in this case than a discovery dispute.  We think it requires us to answer three questions: Must a tribe have jurisdiction over "Indian lands" to compel negotiations?  Has the State waived the "Indian lands" requirement? Is the eleven-acre parcel "Indian lands"? We answer those questions in turn.

A. Must a tribe have jurisdiction over "Indian lands" to compel negotiations?

In *Guidiville Band of Pomo Indians v. NGV Gaming, Ltd*, 531 F.3d 767 (9th Cir. 2008), we described IGRA as requiring a tribe to "show that it has 'Indian lands' as defined by IGRA at the time of filing [suit]." *Id.* at 778. We further agreed with the Sixth Circuit's statement that "it is clear that the State does not have an obligation to negotiate with an Indian tribe until the tribe has Indian lands." *Id.* (quoting *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Engler*, 304 F.3d 616, 618 (6th Cir. 2002)).

Although *Guidiville* did not involve a claim for negotiation under IGRA,[4] we stand by its reasoning. We hold, therefore, that a state need not negotiate with a tribe under IGRA unless the tribe has jurisdiction over Indian lands. As a corollary, jurisdiction over Indian lands is a prerequisite to a suit to compel negotiation under IGRA.

The district court concluded that this prerequisite was satisfied because the State conceded that the nine-acre parcel acquired by the BIA was Indian land. This concession, the court continued, entitled Big Lagoon to good-faith negotiations regardless of the status of the eleven-acre parcel.

We disagree. The IGRA grants the right to request negotiations to the tribe having jurisdiction over "the Indian lands *upon which a class III gaming activity is being conducted, or is to be conducted.*" 25 U.S.C. § 2710(d)(3)(A)

---

[4] The issue in *Guidiville* was whether a contract violated a statute requiring BIA approval of contracts encumbering Indian lands for more than seven years. *See* 531 F.3d at 774–75 (citing 25 U.S.C. § 81(a)).

(emphasis added). The plain meaning of the highlighted language is that a tribe may only request negotiations to conduct gaming on a particular piece of Indian land over which it has jurisdiction.

The Sixth Circuit described the practical significance of § 2710(d)(3)(A) as follows:

> The purposes of this requirement appear to be to ensure that the casino will be inside the borders of the State, to give the State notice of where it will be, and to require the tribe to have a place for the casino that has been federally approved.

*Engler*, 304 F.3d at 618. Although the tribe's ownership of Indian lands was not at issue in *Engler*, the same common-sense concerns support our reading of the statute. If the statute required only that a tribe have jurisdiction over Indian lands, whether or not those lands were to be the site of gaming activity, a tribe with jurisdiction over Indian lands could compel a state to negotiate for a compact to operate a casino on any other parcel. But IGRA authorizes compacts "governing gaming activities *on the Indian lands of the Indian tribe.*" 25 U.S.C. § 2710(d)(3)(B) (emphasis added).

In sum, the only reasonable construction of § 2710(d)(3)(A) is that a tribe's right to request negotiations—and to sue if the state does not negotiate in good faith—depends on its having jurisdiction over Indians lands on which it proposes to conduct class III gaming. Big Lagoon's insistence that gaming be conducted on the eleven-acre parcel tells us that it is the status of that parcel that

matters.   The status of the nine-acre parcel is, as the State agreed at oral argument, "an irrelevancy."

B.  Has the State waived the "Indian lands" requirement?

Before addressing whether the State has waived the "Indian lands" requirement, we briefly respond to the State's contention that a lack of Indian lands deprives the district court of subject-matter jurisdiction to compel negotiations under IGRA.   An objection to subject-matter jurisdiction cannot be waived. *See Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006).

A district court has jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States."   28 U.S.C. § 1331.   A claim depending on a particular construction of federal law falls within this federal-question jurisdiction, even if the court ultimately rejects the plaintiff's construction. *See Bell v. Hood*, 327 U.S. 678, 685 (1946) ("[T]he right of the petitioners to recover under their complaint will be sustained if the Constitution and laws of the United States are given one construction and will be defeated if they are given another.  For this reason the district court has jurisdiction.").   A district court lacks jurisdiction over a federal-question claim only if  "the alleged claim under the Constitution or federal statutes clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or [if] such a claim is wholly insubstantial and frivolous." *Id.* at 682–83.

A claim for negotiations under IGRA, by definition, arises under a law of the United States.   Big Lagoon's claim is neither immaterial nor frivolous.   That the parties dispute the proper construction of IGRA does not transform their dispute

into a question of subject-matter jurisdiction.  In addition, we infer from IGRA's structure that Congress did not intend the "Indian lands" requirement to be an implicit restriction on the district court's general federal-question jurisdiction.  *See Arbaugh*, 546 U.S. at 515 ("[W]hen Congress does not rank a statutory limitation . . . as jurisdictional, courts should treat the restriction as nonjurisdictional in character.") (footnote and citation omitted).  Thus, we conclude that a state may waive the requirement.[5]

As Big Lagoon points out, the State engaged in negotiations for almost ten years without ever challenging the status of the tribe's lands.  What a state may voluntarily do, however, is different than what it can be compelled to do under IGRA.  In the Barstow Compact, for example, Big Lagoon agreed to request that the BIA take the proposed site into trust.  Yet under our decision in *Guidiville*, it could not have compelled the State to negotiate over that site.  *See* 531 F.3d at 778 ("[T]he Indian tribe must show that it has 'Indian lands' as defined by IGRA at the time of filing.").

Big Lagoon further argues that the State conceded the point now on appeal in its answer, which was filed two months after *Carcieri* was decided.  In our view, however, the answer manifests the State's awareness of *Carcieri* and intent to rely on it.  The State admitted that "the United States

---

[5] In contrast to the eleven-acre parcel, the State has explicitly conceded that the nine-acre parcel is Indian land.  We hold the State to that concession.  Indeed, we would do so even if the statutory limitation were jurisdictional because "it is well-settled that one may stipulate to facts from which jurisdiction may be inferred."  *Verzosa v. Merrill Lynch, Price, Fenner & Smith, Inc.*, 589 F.2d 974, 977 (9th Cir. 1978) (quoting *De La Maza v. United States*, 215 F.2d 138, 140 (9th Cir. 1954)).  As we have held, however, the status of the nine-acre parcel is not dispositive.

*considers* [Big Lagoon] to be the trust beneficiary of certain lands the federal government owns in Humboldt County, California."   Any doubt that the State chose its words carefully is dispelled by its allegation that "Big Lagoon is not eligible to be a beneficiary of a trust conveyance pursuant to 25 U.S.C. § 465."  While the State inartfully characterized the allegation as an affirmative defense, it is a clear invocation of *Carcieri*.

The State continued to advance its argument at the summary judgment stage, devoting several pages to explaining exactly why the BIA's 1994 trust acquisition was unlawful under *Carcieri*.  To be sure, the argument was cast as bearing on the State's good faith during negotiations; like the district court, we fail to see the connection.  Nevertheless, the district court obviously understood the State's argument as challenging Big Lagoon's right to negotiate for a casino on the eleven-acre parcel, and addressed it as such in its written decision.  Thus, the issue was preserved for our review.  *See Ahanchian v. Xenon Pictures, Inc.*, 624 F.3d 1253, 1260 n.8 (9th Cir. 2010) (rule against raising issues for first time on appeal "does not apply where the district court nevertheless addressed the merits of the issue" (citation and internal quotation marks omitted)).

C.  Is the eleven-acre parcel "Indian lands"?

We thus come to the heart of our inquiry: Is the eleven-acre parcel "Indian lands"?  Our dissenting colleague reasons that we are compelled to answer in the affirmative based on our statement in *Guidiville* that Congress's use of the present-tense verb *is* to define "Indian lands" requires us to assess the status of land in question at the time of the contract. *See* 531 F.3d at 775.  We agree that the statement informs our

conclusion that, to demand negotiation under IGRA, the site of the proposed gaming must be "Indian lands" at the time of the demand. *See supra* Part II.A.  However, its usefulness to us ends there.

In *Guidiville*, we held that land to be entrusted *in the future* did not qualify as "Indian lands," *see* 531 F.3d at 775. Here, by contrast, we are called upon to decide whether a *past* entrustment qualifies if it turns out to have been invalid. *Guidiville* does not speak to that issue.  Nor does *Carcieri*, which involved a contemporaneous challenge to an entrustment under the Administrative Procedure Act ("APA").  *See* 555 U.S. at 385.[6]  We must look elsewhere for guidance.

We find it in the well-worn rule that "administrative actions taken in violation of statutory authorization or requirement are of no effect." *City of Santa Clara v. Andrus*, 572 F.2d 660, 677 (9th Cir. 1978) (citing, *inter alia*, *Utah Power & Light Co. v. United States*, 243 U.S. 389, 392 (1917)).  Other courts have used different language, *see, e.g.*, *Employers Ins. of Wassau v. Browner*, 52 F.3d 656, 665 (7th Cir. 1995) (unauthorized agency action may be "disregard[ed] . . . as void, a nullity"), but the upshot is the same: The law treats an unauthorized agency action as if it never existed.

Big Lagoon and the dissent argue that a timely suit under the APA is the sole means by which to challenge agency action as unauthorized.  The dissent cites *Wind River Mining Corp. v. United States*, 946 F.2d 710 (9th Cir. 1991), in which we held that the catchall six-year statute of limitations applied to APA actions.  *See id.* at 712–13 (citing 28 U.S.C.

---

[6] Thus, we do not imply that *Carcieri* overruled *Guidiville*.

§ 2401(a)).  We then explained, however, that different types of challenges to agency actions raise different concerns:

> If a person wishes to challenge a mere procedural violation in the adoption of a regulation or other agency action, the challenge must be brought within six years of the decision. . . . The grounds for such challenges will usually be apparent to any interested citizen within a six-year period following promulgation of the decision . . . . The government's interest in finality outweighs a late-comer's desire to protest the agency's action as a matter of policy or procedure.
>
> If, however, a challenger contests the substance of an agency decision as exceeding constitutional or statutory authority, the challenger may do so later than six years following the decision by filing a complaint for review of the adverse application of the decision to the particular challenger.  Such challenges, by their nature, will often require a more "interested" person than generally will be found in the public at large. . . . The government should not be permitted to avoid all challenges to its actions, even if *ultra vires*, simply because the agency took the action long before anyone discovered the true state of affairs.

*Id.* at 715.  Although *Wind River* spoke in terms of a party's right to affirmatively challenge unauthorized agency action,

the D.C. Circuit—whose approach we adopted—has made it clear that the distinction is "equally applicable to defensive attacks in enforcement proceedings." *N.L.R.B. Union v. Federal Labor Relations Auth.*, 834 F.2d 191, 196 n.6 (D.C. Cir. 1987). While we recognize that this case does not involve an enforcement proceeding in the usual sense, we see no reason to treat a third party's enforcement of a right stemming from agency action differently from enforcement by the agency itself.

The concerns we raised in *Wind River* are present here. The 1994 entrustment, standing alone, might not have caused the State any concern. *Cf. North County Community Alliance, Inc. v. Salazar*, 573 F.3d 738, 743 (9th Cir. 2009). One might even question whether the State had standing at that time to challenge the BIA's action under the APA. *See* 5 U.S.C. § 702 ("A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.").[7]

It is true—at least in this circuit—that a challenge to unauthorized agency action is still subject to a six-year time limit. *Cf. Schiller v. Tower Semiconductor Ltd.*, 449 F.3d 286, 293 (2d Cir. 2006) ("The D.C. Circuit has explained that . . . substantive challenges to agency action—for example, claims that agency action is unconstitutional, that it exceeds the scope of the agency's substantive authority, or that it is premised on an erroneous interpretation of a statutory

---

[7] Contrast *Carcieri*, in which the State of Rhode Island was aware that the entrustment was proposed by the Narragansett Indian Tribe with the express purpose of "free[ing] itself from compliance with local regulations." 555 U.S. at 385.

term—have no time bars . . . ."). In *Wind River*, we said that the time runs from "the agency's application of the disputed decision to the challenger." 946 F.2d at 716. Once again bearing in mind that there is no direct agency involvement in this case, we think the most apt analogue to application/enforcement of the 1994 entrustment is Big Lagoon's suit to compel negotiations. As noted above, *see supra* Part II.B., the State promptly challenged the entrustment in response to that suit. We must, therefore, address its challenge on the merits.

As noted, IGRA defines "Indian lands" as

> (A) all lands within the limits of any Indian reservation; and

> (B) any lands title to which is . . . held in trust by the United States for the benefit of any Indian tribe or individual . . . and over which an Indian tribe exercises governmental power.

25 U.S.C. § 2703(4).

The term "reservation" is not further defined. Historically, it referred to the land "reserved" from a cession of lands from a tribe to the United States. *See* Felix S. Cohen, *Cohen's Handbook of Federal Indian Law* § 3.04[2][c][ii] (2005 ed.). Beginning in the 1850s, it came to include public lands "reserved" by the federal government for Indian use. *See id.* In other words, land is part of a reservation if it was (1) withheld from a cession of tribal lands or (2) acquired by the federal government for Indian use.

There are, we suppose, cases in which land held in trust for a tribe is, for some reason, not part of the tribe's "reservation." But whether we call the eleven-acre parcel part of Big Lagoon's reservation or not, its status unquestionably stems from the BIA's acquisition of the parcel in trust for the tribe.

Once again, under *Carcieri* the federal government's authority to acquire land for Indians is limited to acquisitions for tribes that "were under the federal jurisdiction of the United States when the IRA was enacted in 1934." 555 U.S. at 395. The Court did not, however, define what it means for a tribe to be "under federal jurisdiction." *See id.* ("None of the parties or *amici* . . . has argued that the Tribe was under federal jurisdiction in 1934.").

Neither party squarely addresses how we should go about deciding whether Big Lagoon was a tribe under federal jurisdiction in 1934. The State says that further discovery will shed light on the issue, but does not explain how. Big Lagoon argues that it has been a federally recognized tribe since at least the time of the compact negotiations, but we are concerned with its status in 1934, not 1999.

A BIA memorandum tells us that a "helpful . . . starting point" is a list of 258 tribes compiled shortly after the IRA was enacted, but that the list is "not the only or finally determinative source." *See also Carcieri*, 555 U.S. at 298 (Breyer, J., concurring) ("[W]e . . . know that [the BIA] wrongly left certain tribes off the list."). Big Lagoon's undisputed absence from the list, combined with other facts in the record, leads us to the conclusion that the tribe was not under federal jurisdiction in 1934.

Here is what we know from the record: The BIA's acquisition of land in 1918 was for Charley and his family. All were members of the Lower Klamath Tribe, today known as the Yurok Tribe. The BIA confirmed in 1968 that the 1918 acquisition was "not set aside for any specific tribe, band or group of Indians."

Even if the 1918 acquisition amounted to recognition of Charley and his family as a distinct tribal group, Big Lagoon does not trace its roots to that group. Membership in Big Lagoon is, as noted, based on descent from Thomas Williams, the nephew, by marriage, of Charley's son Robert. According to the BIA, Williams and his family were "not formally organized" in 1968.

We agree with the State that there is much confusion in this narrative. Why, for example, did the BIA conditionally approve the dissolution and distribution of rancheria lands if the lands did not constitute a rancheria in the first place? And how did the group go from "not formally organized" in 1968 to an "Indian Tribal Entit[y] That Ha[s] a Government-to-government Relationship With the United States" in 1979?

These questions are thorny indeed, and perhaps beyond our competence to answer. *See Western Shoshone Bus. Council v. Babbitt*, 1 F.3d 1052, 1057 (10th Cir. 1993) (holding that tribe's absence from BIA's list of recognized tribal entities "is dispositive"). But they do not detract from one undisputed fact: There was no family or other group on what is now the Big Lagoon Rancheria in 1934. The central purpose of the IRA was to give "[a]ny Indian tribe, or tribes, residing on the same reservation . . . the right to organize for its common welfare." Ch. 576, § 16, 48 Stat. 987 (codified, as amended, at 25 U.S.C. § 476). Since no one resided on

what is now the rancheria, there was no group to organize. The absence of Big Lagoon from the 258-tribe list was not an intentional or inadvertent omission; it was a reflection of reality.

As we have held, a predicate to the right to request negotiations under the IGRA is jurisdiction over the Indian lands upon which a tribe proposes to conduct class III gaming. IGRA defines "Indian lands" as including lands held in trust for a tribe. *Carcieri* holds that the BIA's authority to take lands in trust for a tribe extends only to tribes under federal jurisdiction in 1934. Thus, the effect of our conclusion that Big Lagoon is not such a tribe is that Big Lagoon cannot demand negotiations to conduct gaming on the eleven-acre parcel, and cannot sue to compel negotiations if the State fails to negotiate in good faith.

## III

We appreciate that Big Lagoon has spent an enormous amount of time attempting to negotiate for a casino on the eleven-acre parcel. And we do not doubt that the State's negotiation position was defined, at least in part, by its belief that the casino should be sited elsewhere. But *Carcieri*, however fortuitously, gives the State the right to refuse to

negotiate the siting issue.[8]   Accordingly, the district court's order compelling negotiations is

**REVERSED** and **REMANDED** with instructions to enter judgment for the State.[9]

---

RAWLINSON, Circuit Judge, dissenting:

I respectfully dissent from the conclusion that the eleven-acre parcel held in trust by the United States for the benefit of Big Lagoon Rancheria does not constitute "Indian lands" under the Indian Gaming Regulatory Act (IGRA).

For purposes of gaming matters, IGRA defines "Indian lands" as:

> (A) all lands within the limits of any Indian reservation; and

---

[8] We express no opinion as to whether Big Lagoon's conceded jurisdiction over the nine-acre parcel would entitle it to request good-faith negotiations—and to bring suit to compel such negotiations, if necessary—for a casino on that site.  Nor need we address the validity of the 1994 entrustment in any other respect than its effect on the parties' respective rights under IGRA.  Accordingly, we deny the State's request for remand to implead the BIA as part of a wholesale challenge to the entrustment.

[9] Our disposition makes it unnecessary to address Big Lagoon's cross-appeal.

(B) any lands title to which *is* . . . held in trust by the United States for the benefit of any Indian tribe or individual . . .

25 U.S.C. § 2703(4) (emphasis added).

Use of the verb "is" in the definition of "Indian lands" embodies context that is important to the resolution of this case. In *Guidiville Band of Pomo Indians v. NGV Gaming*, 531 F.3d 767, 769 (9th Cir. 2008), we were similarly tasked with determining the meaning of "Indian lands" as used in 25 U.S.C. § 81. That statute addresses contracts with Indian tribes and defines "Indian lands" as "lands the title to which *is* held by the United States in trust for an Indian tribe . . ." 25 U.S.C. § 81(a)(1) (emphasis added).

Applying statutory analysis to § 81, we concluded that the "statute's unequivocal present tense use of the word 'is' does a tremendous amount of the legwork" in discerning the meaning of "Indian lands." *Id*. at 774. We determined that use of the present tense in § 81(a) "unambiguously prescribe[d]" that the real estate must be held by the United States in trust at the time of the contract. *Id*. at 775. We noted that Congress' use of verb tense is significant to the process of statutory construction. *See id*. at 776. We also observed that Congress' use of the present tense to define Indian lands unambiguously provided that we look to the present, not the past, to determine if the land is held in trust. *See id*. at 770 ("[W]e conclude that the word 'is' means just that (in the most basic, present-tense sense of the word) . . .").

We cross-referenced the statute at issue in this case as defining "Indian lands" in like fashion. *Id*. at 778 ("[S]ee Section 2703(4)(B), defining 'Indian lands' in part as 'any

lands title to which *is* held in trust by the United States . . .)" (emphasis in *Guidiville*).

I am not persuaded that *Carcieri v. Salazar*, 555 U.S. 379 (2009), overruled our decision in *Guidiville* defining "Indian lands." In *Carcieri*, the United States Supreme Court interpreted 25 U.S.C. § 479, which defines "Indian" generally under the Indian Reorganization Act. *See Carcieri*, 555 U.S. at 381–82. That statute defines "Indian" as including "all persons of Indian descent who are members of any recognized Indian tribe now under Federal jurisdiction . . ." 25 U.S.C. § 479. The Supreme Court interpreted the phrase "now under Federal jurisdiction" in the course of resolving a challenge to the Secretary of the Interior's plan to accept a parcel of land in trust for a particular Indian tribe. *Id.* at 381–82. In that context, and following a timely challenge to the Secretary's decision under the Administrative Procedure Act, the Supreme Court ruled that the Secretary had no authority to take land into trust for a tribe unless that tribe was under federal jurisdiction when the Indian Reorganization Act was enacted in 1934. *See id.* at 382, 391.

Importantly, *Carcieri* says nothing about a collateral challenge to the legitimacy of a designation of trust property outside the parameters of the Administrative Procedure Act. As we noted in *Guidiville*, 531 F.3d at 777, 25 U.S.C. § 465, together with its implementing regulations, details an extensive process that precedes the designation of lands as trust property. This process includes "giv[ing] state and local governments the opportunity to object to the tribe's application . . ." In addition, once the final decision is made to designate lands as trust property, any objector may challenge the decision administratively and in the federal courts. *Id.*; *see also Carcieri*, 555 U.S. at 385 (noting that

objectors sought review under the Administrative Procedure Act of the decision designating lands as trust property).

It is undisputed that until this case, almost eighteen years after the eleven-acre parcel was acquired in trust for Big Lagoon Rancheria, the State of California has not challenged the legality of the trust designation, despite the administrative and judicial avenues available for just that purpose. Surely it cannot be the case that the State of California can launch a collateral attack upon the designation of trust lands years after its administrative and legal remedies have expired. *See*, *e.g.*, *Wind River Mining Corp. v. United States*, 946 F.2d 710, 716 (9th Cir. 1991) (holding that a challenge under the Administrative Procedure Act must be brought within six years of the contested agency action). *Carcieri* certainly does not come anywhere close to such a holding. Indeed, we cannot say how the Supreme Court would have ruled if the challenger in *Carcieri* had not filed a timely challenge under the Administrative Procedure Act or had sued under a different statute entirely. For that reason, we must adhere to our ruling in *Guidiville*. Because *Carcieri* does not directly overrule *Guidiville*, we cannot rely on *Carcieri* to negate our controlling precedent that directly answers the issue before us. *See Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc). As we have held, "as long as we can apply our prior circuit precedent without running afoul of the intervening authority, we must do so." *Lair v. Bullock*, 697 F.3d 1200, 1207 (9th Cir. 2012) (citation and internal quotation marks omitted). Even if intervening authority creates "some tension" with our precedent or "cast[s] doubt" on our precedent, we must still adhere to our precedent. *Id*. Indeed, unless the intervening authority meets the "high standard" of being "clearly inconsistent" with our precedent, we cannot depart from our authority. *Id*. (citations omitted).

Because *Carcieri* in no wise overruled our prior interpretation of 25 U.S.C. § 2703, purported to address IGRA in any way, or considered an untimely challenge to the designation of trust lands, it is not inconsistent with our precedent, and we are bound by our ruling in *Guidiville* that Indian lands for the purpose of IGRA includes lands held in trust for a tribe at the time of the gaming contract. *See Guidiville*, 531 F.3d at 774–75.

In my view, our decision in *Guidiville* forecloses the State's challenge to the legality of the trust. I would affirm the district court's entry of summary judgment in favor of Big Lagoon Rancheria and its denial of the State's motion for a continuance pursuant to Rule 56(f) of the Federal Rules of Civil Procedure.